STATE of Minnesota, Respondent,

v.

Raymond Richard ORTLEPP,
Appellant.

No. C4–83–548.

Supreme Court of Minnesota.

Feb. 15, 1985.

Houge & Gustafson, Benjamin S. Houge, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Janet A. Newberg and Paul R. Kempainen, Sp. Asst. Attys. Gen., St. Paul, Larry Mickelberg, Clay Co. Atty., Moorhead, for respondent.

TODD, Justice.

Defendant was found guilty by a district court jury of aggravated criminal damage to property, a felony, and of unjustifiably killing an animal, a misdemeanor. *See* Minn.Stat. §§ 609.595, subd. 1(1)(3), and 343.21, subd. 1 and 9 (1982). The trial court stayed imposition of sentence for the felony and placed defendant on probation, with probation conditioned on defendant's serving 3 months in jail under the Huber Law. *See* Minn.Stat. § 631.425. The court sentenced defendant to a concurrent 60 day jail term for the misdemeanor and stayed fines of $1,500. Defendant's appeal from judgment of conviction raises a number of issues, the most important being whether the trial court erred in letting the prosecutor call an accomplice and then impeach him with a statement given police in which he admitted his guilt and implicated defendant. We affirm.

Defendant was employed as the chief of police in Ogema, which is in the northwest corner of Becker County in northwest Minnesota. His accomplice, Daniel Steichen, also lived in Ogema. Charles and LuAnne Pinkston owned the property that was damaged and the dog that was killed. They lived near Ulen in northeast Clay County, which is just west of Becker County. The Pinkstons were acquainted with defendant and Steichen; in fact, Charles Pinkston owed Steichen some money.

On the afternoon of July 7, 1982, the Pinkstons and their child were returning from Moorhead. As they approached their farmhouse, they saw a station wagon carrying their lawnmower drive out of their driveway, turn north, and speed away. The Pinkstons, who had had problems with trespassers and vandals all year, gave chase. They followed the car on rural gravel roads at high speeds for approximately 30 miles. At one point, Mrs. Pinkston recognized the occupants of the car as defendant and Steichen. Hoping to "mark" the car for future identification, Mrs. Pinkston shot a hole in it with a .22 caliber rifle. After giving up the chase, they went to the house of some friends who had a telephone, and called the Clay County sheriff. They then drove home.

Deputy Sheriff Richard Burda arrived at the Pinkston residence at approximately 6:55 p.m., before the Pinkstons returned.

He was joined by Deputy Darryl Brown. Together, they inspected the premises and found nothing out of order. The Pinkstons' dogs were all present and unharmed. The two officers then drove to Ulen and called the sheriff's office for more details before returning to the house around 7:30 p.m. The officers met the Pinkstons on the road as they were arriving. The Pinkstons suggested that a neighbor might have seen something, so the officers drove over to check. When the Pinkstons drove up to the house, they discovered that one of their dogs had been shot and killed, another had been wounded, and that their house had been shot at and damaged. Damages to the house were later estimated at $849.

The Pinkstons drove to the neighbor's and told the deputies of their discovery. The deputies returned to the house, examined the dead dog and found three bullet holes. The officers also discovered two groups of bullet holes in the house, one on the main floor and one upstairs, each consisting of 12 holes. Some of the pellets that penetrated the house were later found in the child's upstairs bedroom. In the area in which the deputies believed the shots were fired, they found an empty 12 gauge double ought buck shell that smelled as if recently fired. According to the deputies, law enforcement officers usually carry double ought buck load for their shotguns. Double ought buck shells contain 12 pellets, while a standard 12 gauge shell has only 9 pellets. A gunsmith testified that if an automatic shotgun were used, the shells would probably eject to the right. In other words, if one were inside a car shooting forward from the driver's side, the shells might eject into the car. This may explain why only one shell was found.

Deputy Burda contacted the Becker County Sheriff's Office, since defendant and Steichen were Becker County residents, and said he "wanted" them. Becker County deputies began looking for defendant. First, they visited his home in Ogema and spoke with his wife. Defendant's station wagon, with bullet holes in it and the rear window missing, was there, as was defendant's Ogema squad car. Defend-

ant's "Scout," however, was gone. The officers impounded his station wagon.

The sheriff's deputies located defendant in Callaway, north of Detroit Lakes and south of Ogema, at 11:00 p.m. When asked about the shooting incident, defendant became agitated. He said the officers had no reason for wanting to talk with him, that the Pinkstons had shot at Steichen and him. An officer looked into defendant's Scout and saw a box of shells and an uncased 12-gauge automatic shotgun in open view, the barrel touching the floor and the stock touching the seat. Those items were seized, but they apparently were returned to defendant and therefore were not admitted at trial. Defendant agreed to come in and talk, but insisted that the officers also pick up Steichen.

The deputies, defendant, and Steichen arrived at the Law Enforcement Center after 1:00 a.m. Defendant and Steichen both said the Pinkstons shot out defendant's car window. Using racial epithets to describe Pinkston, who is black, defendant recounted some grievances he had against Pinkston and said he would "get him in my own time."

Steichen agreed to give a formal statement. According to Steichen, after defendant and he had gone to the Pinkston residence to retrieve a lawnmower, the Pinkstons pursued their car at high speeds. Steichen stated that after they had escaped from the Pinkstons, defendant and he threw the lawnmower out, switched cars at defendant's home, and returned to the Pinkston residence. There, using two 12 gauge automatic shotguns, he said they shot two dogs. Steichen stated that he fired only one round and denied knowledge of any damage to the residence. He admitted that as many as three rounds may have been fired.

The physical evidence (the holes in defendant's station wagon) and the testimony of the Pinkstons convincingly established that defendant and Steichen were the men the Pinkstons pursued. The more difficult issue for the jury to decide was whether

defendant and Steichen went to the Pinkstons', shot the dogs, and damaged the house. In an attempt to obtain testimony from Steichen, the prosecutor dismissed the complaint against him and, upon learning that Steichen would claim the Fifth Amendment privilege if called, obtained an order granting him immunity. In his opening statement, the prosecutor summarized Steichen's statement to the officers. Shortly before calling Steichen, the prosecutor told the court that, after talking with Steichen, he believed that he would have to use Steichen's statement to impeach him and was concerned that Steichen would claim the statement had been coerced. The prosecutor then sought an order (1) to establish, as a matter of law, that the statement had not been coerced and (2) to preclude either Steichen or defense counsel from contending otherwise. Defense counsel agreed that the prosecutor should be permitted to impeach Steichen with the statement if the prosecutor could show that Steichen was an adverse witness. The defense argued, however, that it should be permitted to elicit testimony from Steichen tending to show that the statement was coerced. The court agreed that defense counsel should be permitted to elicit such testimony.

The prosecutor then called Steichen, who admitted giving the statement. Steichen claimed, however, that it was false, and that the officers who questioned him had put words in his mouth and had otherwise coerced the statement. In testifying, he admitted that he had been with defendant all day, but denied going to the Pinkston residence in the afternoon. He admitted that there had been a chase and that they had been shot at, but denied going to the Pinkstons' later and shooting guns there. He admitted they did not report that the Pinkstons had shot at them and testified that defendant said he would talk to someone about it the next day. Defense counsel sought an immediate limiting instruction but the court deferred giving one until its final instructions. In his closing statement, the prosecutor tried to argue that Steichen's statement could be used as substantive evidence of defendant's guilt, but the court sustained an objection to this line of argument.

■ 1. Defendant contends this case should never have been tried and he complains that no hearing was held on whether there was probable cause to proceed to trial. There are two answers to his complaint. First, defense counsel did not push for an omnibus hearing on the issue of probable cause. Second, defendant clearly was not prejudiced by the lack of such a hearing for the complaint alone showed there was probable cause to proceed to trial.

2. Defendant advances a number of arguments regarding the fairness of his trial.

(a) The most significant issue involves the propriety of the prosecutor's calling Steichen and using his prior statement to impeach his testimony, and the prejudicial impact, if any, that had. Defense counsel did not object to the prosecutor's use of the prior statement to impeach Steichen; in fact, defense counsel agreed this was permissible. Since defendant claims, however, that counsel failed to represent him effectively and cites this lack of objection as proof, we consider the issue.

In *State v. Dexter*, 269 N.W.2d 721 (Minn.1978), we first addressed the problem created by a party's impeachment of its own witness with a prior inconsistent statement and the interplay between Minn. R.Evid. 801(d)(1)(A) and Minn.R.Evid. 607. Under Rule 801(d)(1)(A), a prior inconsistent statement is admissible substantively only if the declarant "testifies at the trial or hearing and is subject to cross-examination concerning the statement" and that statement "was given under oath subject to the penalty of perjury at trial, hearing, or other proceeding, or in a deposition." Under Rule 607, the "credibility of a witness may be attacked by any party, including the party calling him." Since Rule 607 does not contain a restriction similar to that in Rule 801(d)(1)(A), there is a possibility that impeachment may be misused. For example, the problem arises when a prose-

cutor calls a witness who has given a prior statement implicating the defendant, but that witness has since retracted the statement and signified an intent to testify in defendant's favor if called by the prosecutor. If the prosecutor is permitted to call this witness and use the prior statement for impeachment purposes, there is a large risk that the jury, even if properly instructed, will consider the prior statement as substantive evidence. In *Dexter*, we stated:

> There are two basic ways which have been suggested of resolving the problem. One commentator has urged a reliance on the factors of surprise and affirmative damage. Judge Weinstein in his treatise on the Federal rules urges relying on Rule 403, requiring a determination of whether the potential of the impeaching evidence for unfair prejudice outweighs its probative value.
>
> We think Judge Weinstein's suggested approach is preferable, but we need not decide the matter because under either approach the district court's ruling must be affirmed.

*Dexter*, 269 N.W.2d at 722 (Citations omitted).

Professors Louisell and Mueller state:

> Rule 607 allows a party to impeach his own witness without showing surprise, and probably without showing damage either. It does not follow, however, that the calling party is entitled under the Rule to impeach his witness by a prior inconsistent statement * * * where (i) the testimony of the witness has conveyed no data of significance in the case, but (ii) the prior statement does assert important data, and (iii) the statement would violate the hearsay rule if received for its truth. Here, the impeachment effort should .be viewed as highly suspect, particularly where it seems to have been the main purpose of the calling party to get the prior statement before the trier of fact. Here, the relevance of the prior statement in undermining credibility seems to be substantially outweighed by the risk of unfair prejudice

to the opponent of the calling party, and the trial court should invoke Rules 403 and 611 to cut short or block altogether the impeaching effort. Likewise, the court should invoke these Rules even where the witness has given important testimony, if the calling party seeks to impeach by prior inconsistent statements unrelated to such testimony but asserting other important points in the case.

3 D. Louisell & C. Mueller, Federal Evidence § 299 at 195 (1980) (footnote omitted).

The prosecutor knew that Steichen's testimony was not going to be helpful and yet he called him for the purpose of getting his prior statement before the jury under the guise of impeachment. In fact, the prosecutor referred to the content of Steichen's statement in his opening remarks and, before an objection was sustained, he spoke in summation as if the prior statement had been admitted as substantive evidence of defendant's guilt.

The parties in their briefs do not address the question whether Steichen's statement was admissible substantively. If it was, the *Dexter* problem is not present and defendant has no legitimate cause to complain.

■ The statement was a prior statement in which Steichen not only implicated defendant in the crime but also confessed his own guilt. Statements against interest are admissible under Minn.R.Evid. 804(b)(3) if the declarant is unavailable as a witness, but when offered against an accused in a criminal case, a serious confrontation clause problem arises. *See State v. Hansen*, 312 N.W.2d 96 (Minn.1981); 4 D. Louisell & C. Mueller, Federal Evidence § 489 at 1182–83 (1980). Steichen's statement is not admissible under Rule 804(b)(3) because the rule presupposes the unavailability of the declarant. Similarly, it is not the type of statement that fits within any of the standard exceptions to the hearsay rule that apply when the declarant is available and does testify. *See* Minn.R.Evid. 803.

However, Rule 803(24) creates what has been termed a "catchall exception" that allows hearsay to be admitted in cases in which the declarant testifies if certain conditions are satisfied, the key one being that there are circumstantial guarantees of trustworthiness equivalent to those surrounding statements fitting within the 23 specific exceptions created by Rule 803. Rule 803(24) is identical to Rule 804(b)(5), which is the corresponding "catchall exception" to be used when the declarant is unavailable. *See State v. Posten*, 302 N.W.2d 638, 641 (Minn.1981). We have considered either Rule 803(24) or 804(b)(5) in a number of cases, including: *State v. Langley*, 354 N.W.2d 389 (Minn.1984) (admission of hearsay accounts of prior assaults upon homicide victim by defendant under Rule 804(b)(5)); *State v. Hansen*, 312 N.W.2d 96 (Minn.1981) (holding in a criminal case that a statement by an unavailable declarant was not admissible as a declaration against his penal interest and was not admissible under Rule 804(b)(5) either); *State v. Posten*, 302 N.W.2d 638 (Minn. 1981) (admission under Rule 804(b)(5) of evidence of statement made by a 6-year-old rape victim during bad dream shortly after incident); *State v. Olisa*, 290 N.W.2d 439 (Minn.1980) (admission under Rule 804(b)(5) of document prepared by unavailable German clerk because there was sufficient indicia of reliability).

We conclude that Steichen's prior statement is a particularly reliable statement that could have been admitted as substantive evidence of defendant's guilt under Rule 803(24). First, there is no confrontation problem presented by the admission of the statement as substantive evidence, since Steichen testified, admitted making the prior statement, and was available for cross-examination by defense counsel. *See California v. Green*, 399 U.S. 149, 158, 90

S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *State v. Gustafson*, 266 N.W.2d 878, 879 (Minn.1978). Second, since Steichen admitted making the prior statement, there was no real dispute over whether he made it or over what it contained. Indeed, the prior statement was taped. Third, the statement was against Steichen's penal interest, a fact that increases its reliability. Fourth, the statement was consistent with all the other evidence the state introduced, evidence which pointed strongly toward both defendant and Steichen's guilt. Cases supporting our conclusion include *United States v. Barnes*, 586 F.2d 1052 (5th Cir. 1978) (upholding admission, under Rule 803(24), as substantive evidence of the defendant's guilt, declarant's prior statement implicating defendant, where declarant was unavailable, where statement was also against defendant's penal interest, and where statement was strongly corroborated by other evidence); *United States v. Williams*, 573 F.2d 284 (5th Cir.1978) (same).[1] Since Steichen's prior statement was admissible as substantive evidence under Rule 803(24), defendant has no cause to complain that its admission for impeachment purposes violated *Dexter*.

(b) A second claim of trial error is based on the lack of an omnibus hearing to determine the admissibility of defendant's statements to the police. The State suggests that no omnibus hearing is needed if statements are exculpatory. We hold otherwise. As stated in D. Kammeyer, *The Omnibus Hearing*, 39 (1980), a publication of the Minnesota County Attorneys Counsel:

Statements, apparently exculpatory on their face, may occasionally have the backhand effect of actually being inculpatory or, at least, of showing defendant

---

1. Consider also, *DiCarlo v. United States*, 6 F.2d 364, 368 (2nd Cir.1925) (Learned Hand, J.), *cert. denied*, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925):

The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all

that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.

to be a liar. As such, these exculpatory statements may be helpful to the prosecution in its case-in-chief. Given the language of *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it appears necessary to include them in the 7.01 notice if the State does intend to use them at trial:

> "The prosecution may not use statements, *whether exculpatory or inculpatory* stemming from custodial interrogation of defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* (emphasis added).

■ One answer to defendant's contention is that his counsel acquiesced in deferring a decision on the admissibility of defendant's statements until the day of trial. On the day of trial, the parties argued the admissibility of the statements, but the trial court stated it could not decide the issue without testimony. Defense counsel did not push for an evidentiary hearing at that point, and defendant on appeal has not demonstrated that such a hearing would have benefitted him. In addition, it appears that defendant was not under arrest at the time he made the statements. In fact, it appears he was specifically told that he was free to leave. Knowing full well, as a police officer, what his rights as a citizen were, he nonetheless chose to stay and talk, exercising his right to remain silent only after he was given a *Miranda* warning and asked for a formal statement.

■ (c) Defendant also complains about the admission of testimony revealing what his wife told police, when they came looking for him at his house, that defendant had been there but left. This testimony came in response to a question about what the officer told defendant's wife at that time. Defense counsel objected and the court impliedly sustained the objection, telling the witness to avoid saying what the wife said. Defense counsel did not ask the court to strike the answer. Any error was clearly nonprejudicial.

■ (d) Defendant next challenges the trial court's failure to give an instruction on the need for corroboration of an accomplice's testimony. As we indicated, Steichen's prior statement could have been admitted as substantive evidence. If that had occurred, defendant would have been entitled to an instruction on the need for corroboration. Since the prior statement of Steichen was admitted only for impeachment purposes, no instruction was needed. Moreover, defense counsel never requested such an instruction.

■ (e) Finally, defendant argues that the court erred in giving an "aiding and abetting" instruction. The fact that section 609.05 was not mentioned in the complaint does not mean that it was error to give such an instruction. *See State v. DeFoe,* 280 N.W.2d 38, 40 (Minn.1979) (failure to specifically cite aiding and abetting statute in complaint did not bar conviction of defendant on basis of his conduct in aiding and abetting aggravated robbery). Defense counsel did not object to this instruction. In any event, it was proper.

■ 3. Defendant next contends that the evidence of his guilt was legally insufficient. As we have stated, Steichen's prior statement could have been admitted as substantive evidence of defendant's guilt. Even without that evidence, however, the State met its burden of proof. Defendant and Steichen were seen leaving the farm, with a lawnmower in the car, and the Pinkstons gave chase, "marking" defendant's car by shooting at it. Apparently, the dogs were shot and the house was damaged during the 45 minute interval between when the deputies first arrived and when the Pinkstons returned and discovered the damage. Defendant, although a police officer, did not report that he had been shot at, a fact that has strong evidentiary value. The evidence clearly established that Steichen and defendant had a motive and an opportunity to seek revenge. When police found defendant at 11:00 p.m., he had a 12 gauge automatic shotgun and a box of shells. The gun and the shells were returned to defendant, but it is likely that

these shells were the type used in the shooting, as the evidence indicates that the shells used were the kind typically carried by police for use in their shotguns. Finally, defendant's statements to the sheriff's deputies, although not amounting to a confession, were inculpatory in nature. Considering all the evidence, we conclude that the evidence of defendant's guilt was sufficient.

 4. Defendant's final contention is that defense counsel failed to represent him effectively. There is no merit to this contention. Defense counsel could have argued *Dexter*, but, as we have stated, *Dexter* was inapplicable because Steichen's prior statement was admissible as substantive evidence of defendant's guilt.

Affirmed.