**STATE of Minnesota, Respondent,**

v.

**Arthur William LUCAS, Appellant.**

**No. C7–84–344.**

Supreme Court of Minnesota.

Aug. 16, 1985.

---

**1.** We agree with the compensation judge that this may be an appropriate case for retraining.

C. Paul Jones, Minnesota State Public Defender, J. Christopher Cuneo, Ass't State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., Robert A. Stanich, Sp. Asst., Atty. Gen., St. Paul, Julius E. Gernes, Winona Co. Atty., Winona, for respondent.

COYNE, Justice.

Defendant, Arthur William Lucas, was found guilty by a district court jury of first-degree murder and conspiracy to commit first-degree murder, Minn.Stat. §§ 609.05, 609.175, subd. 2(2), and 609.-185(1) (1984), for participating with his girl friend, Carlene Ann Buschkopf, in the planned "killing for insurance" of her hus-

band, Theodore, ("Ted") Buschkopf. Defendant was sentenced by the trial court to a mandatory term of life imprisonment for the murder; he was not sentenced for the conspiracy but was formally adjudicated guilty of it. On this appeal from judgment of conviction, defendant contends (1) that he should be given a new trial because of errors by the trial court in admitting certain evidence and in instructing the jury, or, failing that, (2) that his conviction of conspiracy should be vacated. Concluding that defendant received a fair trial and was properly convicted of both offenses, we affirm.[1]

Shortly before 7:30 a.m. on July 26, 1983, a guest at the Westgate Motel in Winona notified the manager that he heard a voice calling for help. The manager found Carlene Buschkopf lying in the doorway of the unit she was sharing with her husband, Ted. Carlene had a gunshot wound in the lower back and was complaining of pain. Paramedics called to the scene entered the room and found Ted in bed, unconscious as the result of a gunshot wound in the back of his head. Both Carlene and Ted were taken to the hospital in Winona, where Carlene underwent surgery for the removal of a bullet lodged in her abdomen. Ted was transferred to a hospital across the river in LaCrosse, Wisconsin, where neurosurgeons treated his head wound. He died 12 days later without regaining consciousness.

Carlene told police that they had spent the previous evening with defendant drinking at the Twin Bluff Motel Bar between Winona and LaCrosse and that at closing she had returned with Ted to their room at the Westgate and fallen asleep. She said that she woke sometime during the night and felt a sharp pain in her lower back. She said that when Ted did not answer her, she crawled to the doorway and began calling for help. She claimed it was a couple hours before anyone responded.

Questioned by police in LaCrosse, where he lived, defendant claimed that after the Twin Bluff Bar closed he drove to Onalaska, Wisconsin, and spent the night at the apartment of a woman named Judy Baker, who was a bartender at the Lakeview Bar in Onalaska. He claimed he was with her until about 6:25 a.m., when she made him leave so he would be gone when her children awoke.

LaCrosse police arranged to meet with Baker at her residence that afternoon but she missed that appointment. She called the police back the next day, July 27, and was interviewed a few hours later at the LaCrosse Police Department by an agent of the Minnesota Bureau of Criminal Apprehension (MBCA) and a Winona police officer. She did not corroborate the alibi defendant gave the police but provided a different one, saying that defendant was passed out in his car in the bar parking lot when she left work at 2:00 a.m. and that she returned to the lot at 5:30 a.m. to check on him and found him still asleep.

When the MBCA agent said he did not believe her and asked her to tell them what really happened, Baker began crying and proceeded to relate a different story. She said that during the week of July 10 defendant told her that Carlene and he had a plan to get some insurance money and solve his financial problems by getting rid of someone. She said that defendant also said that previous attempts to kill the person had failed.

Baker said she next saw defendant on July 23, when he offered her $1,000 if she would provide an alibi for him for a couple hours that night. She said she refused the money but did spend some time with him that night. She claimed that on July 25 she received a call from Carlene Buschkopf about her having agreed to provide an alibi for defendant. She told Carlene that she had not agreed to do that and said that she suggested to Carlene that there must be another way of working things out. Carlene responded by saying that everything else had been tried and that this would be the last attempt.

---

**1.** Carlene Buschkopf was also convicted of both offenses and sentenced to a life term.

Baker said that at 7:30 p.m. on the 25th defendant stopped at the Lakeview Bar, where she worked, and got her to agree to let him spend the night with her. She said that he did not return later, as promised, but called her at 6:30 a.m. on the 26th and said, "It's been done, it went down, it's over." He told her that if anyone asked her if she'd been with him she should say that they were together between 5:15 and 5:30 a.m. She claimed she received another call from him on the morning of the 27th, which was after defendant gave police his alibi but before she was questioned by the police. She told him she would not say he spent the night with her but did promise to say she had seen him passed out in the parking lot.

After telling her story to the officers, Baker agreed to make some phone calls to Carlene and defendant and to allow the officers to tape them. In the first call, to Carlene in the hospital at 11:15 a.m. on the 28th, Baker said she was scared and wanted to talk with someone. Carlene told her not to admit anything, gave her an Illinois phone number at which to reach defendant, and asked her to tell defendant, "I can't replace one." When Baker asked Carlene about the shooting, Carlene said that Ted was asleep when it happened and that it was not defendant who shot him. Carlene told Baker she would not get paid for her help until after Carlene left the hospital.

Baker called the Illinois number, that of defendant's wife, but was not able to reach defendant until 5:30 p.m. Defendant, who was reluctant to talk over the phone, told Baker that everything was all right and that she should stick to her story. When Baker asked him about Carlene's message that she "can't replace one," defendant said he'd already taken care of that part of it. He also said that Carlene's being shot was part of the plan.

In a second phone conversation later that night they discussed the story Baker had told the police. When Baker asked about the money, defendant told her he did not have any. Baker again asked defendant about the message she had given him from Carlene and he said it meant that Carlene could not replace the thing that was used. Upon further questioning, defendant said that his gun had been involved, that he had already disposed of it and that he had covered it on his end. Baker asked why Carlene had been injured so badly and defendant said that must have been a slip-up. Defendant told Baker that he did not shoot Ted and neither did Carlene.

The police later learned that other people were involved in the conspiracy to kill Ted Buschkopf. These people—Patricia Balk, Tim Fraley, Peter Fraley, and Tina Skarbeck—testified concerning several earlier attempts on Ted's life. None of them testified regarding the shooting on the morning of the 26th.

Police also learned (a) that defendant and Carlene had been having an affair, (b) that they had operated a restaurant together but that the restaurant had failed and that they were experiencing serious financial difficulties, (c) that Carlene recently had persuaded Ted to name her the primary beneficiary on his life insurance policy and that she expected to receive approximately $80,000 under two policies, and (d) that defendant and Carlene recently had asked a number of people about obtaining a gun.

Defendant admitted at trial that he was a part of a conspiracy to kill the victim and that he had asked Baker to provide him with an alibi, but he claimed that he withdrew from the conspiracy on the 24th, before the killing occurred, and that he therefore could not be convicted of the murder charge, only of the conspiracy charge. He claimed that he received a call at 6:30 a.m. on July 26 from a man who said, "Buschkopf has been shot, so can you." He testified that he became scared that he would be a suspect, so he called Baker and again asked her to provide him with an alibi.

1. Defendant makes a number of arguments in support of his main contention, which is that he did not receive a fair trial and, therefore, should be given a new one.

(a) Defendant first argues that the trial court erred in admitting the tape recordings of the phone conversations because

the tapes were made in Wisconsin and Wisconsin law provides that tape recordings of telephone conversations made with the consent of only one of the two parties to the conversation are inadmissible at trial unless the tapes were made pursuant to a search warrant.

In *State v. Bellfield*, 275 N.W.2d 577 (Minn.1978), we held that if one of the parties to a conversation consents to the taping of the conversation, no search warrant is required under either Minnesota law or Federal law—*see* 18 U.S.C. § 2511(2)(c) (1982) and Minn.Stat. § 626A.02, subd. 2(c) (1984)—and the resulting tape of the conversation is admissible in evidence (provided, of course, that adequate foundation is laid and the tape is not rendered inadmissible by some other rule of exclusion such as the hearsay rule). As defendant points out, it appears that the law in Wisconsin is different. There, as here, the taping of a conversation is lawful if one party to the conversation consents, but, contrary to our practice, the resulting tape is inadmissible in evidence unless the taping was authorized by a search warrant. *State ex rel. Arnold v. County Court of Rock County*, 51 Wis.2d 434, 187 N.W.2d 354 (1971). *See also State v. Smith*, 72 Wis.2d 711, 242 N.W.2d 184 (1976) (affirming the holding in *Arnold* but holding that the inadmissibility of the tape does not prevent the consenting party to the conversation from testifying as to what was said). Defendant argues that the trial court should have applied the Wisconsin rule of exclusion, because the telephone calls and the tapes were made in Wisconsin, and that the trial court's failure to do so was prejudicial.

■ It is clear that evidence obtained in another state in violation of the Federal Constitution is subject to the same rule of exclusion that would apply if the evidence had been obtained in this state. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); 1 W. LaFave, Search and Seizure § 1.3(c) at 50 (1978). There is, however, no requirement that evidence obtained in another state be excluded in this state merely because it would be inadmissible if the prosecution were in that other state. 1 W. LaFave, Search and Seizure § 1.3(c) at 51–52.

■ Courts in other jurisdictions have taken various approaches to the admissibility of evidence illegally obtained in another state. Using a mechanical form of conflicts of law analysis, the Texas Court of Criminal Appeals held in *Burge v. State*, 443 S.W.2d 720 (Tex.Crim.App.1969), *cert. denied*, 396 U.S. 934, 90 S.Ct. 277, 24 L.Ed.2d 233 (1969), that evidence illegally seized in Oklahoma was admissible because the law of the forum governs procedure and rules of evidence. In *People v. Saiken*, 49 Ill.2d 504, 275 N.E.2d 381 (1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1499, 31 L.Ed.2d 796 (1972), the Illinois Supreme Court relied on a "significant relationship" or "group of contracts" conflicts of law approach to uphold the admission of evidence seized in an illegal Indiana search. Applying a "governmental interest" conflicts approach, the California Court of Appeals weighed the competing interests of the forum state against those of the place of the illegal search and ruled the evidence admissible. *People v. Orlosky*, 40 Cal. App.3d 935, 115 Cal.Rptr. 598 (1974).

These three approaches are discussed critically at 1 W. LaFave, Search and Seizure § 1.3(c) at 52–56 and at R. Tullis and L. Ludlow, *Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule*, 10 U.S.F. L.Rev. 67, 82–91 (1975). Tullis and Ludlow identify three basic situations in which a defendant will move to suppress evidence seized in another jurisdiction: (1) where the evidence was illegally obtained under the law of the place of the search and where it would also be considered illegally obtained in the forum state if the search had occurred there; (2) where the evidence was illegally obtained under the law of the place of the search but where it would not be regarded as illegally obtained according to the law of the forum (the situation in *Orlosky*, *Saiken* and *Burge*); (3) where

the seizure of evidence was valid under the law of the place where the search occurred but where it would be regarded as unlawful if it had occurred in the forum state. They argue that, following an exclusionary rule analysis, the forum state should suppress the evidence in the first situation, that the forum state should not suppress it in the second situation unless forum officers participated in the search in the state where the search occurred, and that the forum state should not suppress it in the third situation. *Id.* at 90–91.

Professor LaFave argues also for an exclusionary rule analysis. He points out that the policy reasons underlying the exclusionary rule for violation of forum law do not necessarily apply with the same force to violations of the law of another state:

> The prospect of deterrence is more remote, as is the judicial taint from acceptance of the evidence, and there has been no profit from its own wrongdoing by the convicting jurisdiction.

1 W. LaFave, Search and Seizure § 1.3(c) at 55.

We deal here with a factual situation somewhat analogous to but different in one significant respect from the type of situation presented in *Burge, Saiken* and *Orlosky*, the second of the situations identified by Tullis and Ludlow. Wisconsin, the place where the conversations were taped, does not regard as illegal the warrantless taping of a telephone conversation with the consent of one party to the conversation. The Wisconsin rule, based on the wording of a Wisconsin statute,[2] is simply that the resulting tape, although legally obtained, is nevertheless inadmissible into evidence.

■ While it seems clear to us that the tape was admissible in this prosecution under all of the approaches we have mentioned, we conclude that it is preferable to use an exclusionary rule analysis rather than a traditional conflicts of law approach to determine the admissibility of evidence obtained in another state. Taking into account the several policy reasons underlying the exclusionary rule, we readily conclude that in this case the trial court correctly refused to suppress the evidence. Neither the Wisconsin police who taped Baker's conversations with defendant and Carlene Buschkopf nor the Minnesota police who suggested that Baker make the calls and who participated in the taping violated the laws of either Wisconsin or Minnesota. Hence, exclusion of the tapes would not serve to deter misconduct by police officers of either Minnesota or Wisconsin. On the other hand, admission of the tapes does not compromise judicial integrity and does not have the effect of permitting Minnesota to profit from any wrongdoing. We express no opinion, however, regarding the appropriate resolution of the suppression issue where evidence has been procured in violation of the law of either the place of the search or the forum state or both.

(b) Defendant argues secondly that the trial court erred in admitting hearsay evidence, specifically (i) Carlene Buschkopf's statements to Judy Baker after Ted Buschkopf was shot, and (ii) Baker's statements to police on July 27.

■ (i) Under Minn.R.Evid. 801(d)(2)(E), a statement is not hearsay if "the statement is offered against a party and is * * * a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Defendant argues that Carlene Buschkopf made the statements to Baker after the termination of the conspiracy. We disagree. In *State v. Davis*, 301 N.W.2d 556 (Minn.1981), we held that the trial court properly admitted statements made by a coconspirator after the commission of the principal crime because the facts established that there was an agreement by the parties to the conspiracy to conceal and because the statements were made shortly after the incident and bore strong indicia of reliability. And in *State v. Howard*, 324 N.W.2d 216 (Minn.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818,

---

2. Wis.Stat. §§ 968.27 through 968.33 (1984). *State v. Smith,* 72 Wis.2d 711, 242 N.W.2d 184 (1976); *State ex rel. Arnold v. County Court,* 51 Wis.2d 434, 187 N.W.2d 354 (1971).

74 L.Ed.2d 1016 (1983), a murder for hire case, we upheld the admission of statements by the hired killer after he killed the victim but before he had received payment. In this case the primary objective of the conspiracy was to murder Ted Buschkopf so that Carlene, one of the conspirators, could collect life insurance, part of the proceeds of which would then be paid to the other conspirators. There obviously was a concealment phase; the statements of Carlene Buschkopf were made shortly after the shooting and before the victim's death; and they bore obvious indicia of reliability. The statements also were made in furtherance of the continuing conspiracy to defraud the insurance company and before any payments to coconspirators had been made.

■■■■ (ii) The trial court permitted the officers who questioned Baker on the 27th to relate some of the statements she made. The court based its ruling on Minn.R.Evid. 801(d)(1)(B), which provides that a statement is not hearsay if "the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *." The court reasoned that defense counsel "opened the door" to admission of testimony concerning some of Baker's statements on the 27th by asking Baker questions which showed first that her memory of what Carlene and defendant said was bad and second that Baker had a motive to lie because her former sister-in-law and friend Patricia Balk had been arrested as a coconspirator. Defendant argues primarily that it was error for the court to allow the jury to give substantive effect to the testimony concerning the prior statements and that this deprived him of his opportunity to effectively confront and cross examine Baker. The argument that it was error to give the prior statements substantive effect ignores the fact that Rule 801(d)(1)(B) exempts certain prior consistent statements from the definition of hearsay, thereby making those statements

admissible as substantive evidence. *Slater v. Baker,* 301 N.W.2d 315, 319 (Minn.1981); 11 P. Thompson, Minnesota Practice, Evidence § 801.06 (1979); 4 J. Weinstein and M. Berger, Weinstein's Evidence § 801(d)(1)(B)[01] (1979). The argument that giving the statements substantive effect deprived defendant of his opportunity to effectively confront and cross examine Baker is, on its face, meritless; Baker testified and was subjected to full cross examination by defense counsel under the rules. *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970); *State v. Ortlepp,* 363 N.W.2d 39, 44 (Minn.1985).

■■■■ (c) Defendant argues next that the trial court's instructions allowed the jurors to find defendant guilty of murder even if they accepted defendant's contention that he withdrew from the conspiracy before the shooting of Buschkopf. The trial court's instructions, which were based on 10 Minn. Dist. Judges Assn., Minnesota Practice, CRIMJIG 4.01, 4.02 and 4.04 (1977), stated:

> Jurors, our body of law provides that a person may be liable for [a] crime committed by another under certain circumstances, and you are instructed that the Defendant is guilty of a crime committed by another person if he intentionally aided the other person in committing it, or intentionally advised or hired or requested the other person to commit it.

> The Defendant is guilty of a crime, however, only if the other person commits a crime. The Defendant is not liable criminally for aiding, advising, hiring, or requesting the commission of a crime, unless some crime is actually committed.

> Even if the Defendant aided, advised, hired or requested the commission of a crime by another person, the Defendant is not liable for any crime if he abandoned his purpose and made a reasonable effort to prevent the crime before the crime was committed.

> The Defendant is guilty of a crime committed by another person if he conspired

with the other person to commit the crime.

The Defendant is guilty of a crime, other than the crime of conspiracy, however, only if the crime is actually committed. But the Defendant is guilty of conspiracy if he has conspired to commit a crime, even if the crime is not actually carried out.

Defense counsel objected only that it would be cumulative for the trial court to read both the instructions on accomplice liability and the one on coconspirator liability. Defense counsel made no objection to the court's proposed instructions when the court distributed copies to counsel. There may be some force to the argument defendant now advances, that paragraph 3 of the instructions seems to say that defendant was not liable for the murder if he successfully withdrew from the conspiracy before the shooting whereas the next paragraph seems to suggest that defendant was liable for the shooting if at any time he conspired to commit murder. We are satisfied, however, that the jury was not confused. We note further that the defense of withdrawal was totally meritless: there was no evidence that defendant made any effort to warn the police or the victim or prevent the other coconspirators from committing the crime. Without deciding whether the court would have been justified in refusing to instruct regarding withdrawal—*see State v. Alexander*, 290 Minn. 5, 11, 185 N.W.2d 887, 891 (1971)—we are satisfied that clearer instructions on this point would not have made any difference in the verdicts.

■ (d) Defendant also objects now to the trial court's use of the word "coconspirator" rather than naming Carlene Buschkopf in its instructions on the elements of conspiracy. When discussing these instructions, the prosecutor proposed that the trial court name not only Carlene Buschkopf but the other coconspirators. Defense counsel objected because the others were not named in the indictment. The trial court said that he agreed with defense counsel and then read the attorneys the instruction he intended to give, one that named Carlene Buschkopf. However, when the court provided counsel with copies of the final version of the instructions which the trial court intended to read to the jury, the word "coconspirator" was used instead of Carlene Buschkopf's name. Defense counsel did not object at that time nor when the court read the instruction to the jury. It is not clear whether defense counsel's failure to object was because he was satisfied with the charge or because he did not spot the change. In any event, the change seems to us an insignificant one that could not have prejudiced defendant, since the court also read the jury the indictment, which named only Carlene Buschkopf as a coconspirator, and since all of the attempts to kill Ted Buschkopf following defendant's joining the conspiracy involved Carlene Buschkopf.

■ (e) Finally, defendant argues that the trial court's response to a question by the jurors during their deliberations improperly informed the jurors that the conspiracy charge did not relate solely to the shooting that resulted in Ted Buschkopf's death. Specifically, the jurors asked the court whether the charge encompassed the time period set forth in the indictment (June 1, 1983 to and including July 29, 1983) or whether it related solely to the date of the shooting. Defendant now argues that the response improperly undercut his defense to the conspiracy charge. This argument is baseless since defendant had no real defense to the conspiracy charge. It is true that defendant claimed that he withdrew from the conspiracy before the shooting, but this was no defense to the conspiracy charge since it is clear that any acts alleged to constitute a withdrawal occurred after an overt act (indeed after more than one overt act) in furtherance of the conspiracy was performed. *See State v. Liljedahl*, 327 N.W.2d 27, 30 (Minn.1982) (withdrawal from a conspiracy after an overt act has been committed may shield the defendant from criminal liability for the offense that was the object of the conspiracy but not from liability for the crime of conspiracy). Indeed, defense counsel in effect conceded to the jury that

defendant properly could be found guilty of the conspiracy charge and focused the jury's attention on the real dispute, whether defendant properly could be found guilty of the murder charge.

In conclusion, we are satisfied that defendant received a fair trial.

2. Defendant's only other contention is that his conspiracy conviction should be vacated because conspiracy to commit first-degree murder is a lesser included offense of first-degree murder and under Minn. Stat. § 609.04 (1984) a defendant may not be convicted of both the crime charged and an included offense. Section 609.04, subd. 1, states that an included offense may be any of the following:

(1) A lesser degree of the same crime; or

(2) An attempt to commit the crime charged; or

(3) An attempt to commit a lesser degree of the same crime; or

(4) A crime necessarily proved if the crime charged were proved; or

(5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.

Defendant points out that he was charged under section 609.05 with aiding and abetting first-degree murder and argues that proof of that charge necessarily required proof of a conspiracy to commit first-degree murder because section 609.05 provides that one is liable as an aider and abettor for a crime committed by another if one "intentionally aids, advises, hires, counsels, *or conspires* with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1 (1984).

 Under the approach that we have long taken, we must look at the statutory definitions rather than the facts in a particular case to determine if the lesser offense is necessarily included. *State v. Gayles,* 327 N.W.2d 1, 3 (Minn.1982); *LaMere v. State,* 278 N.W.2d 552, 557–58 (Minn. 1979). If one cannot commit the charged

offense without committing the lesser offense, then the lesser offense is a necessarily included offense. If, on the other hand, one can commit the charged offense without committing the lesser offense (because the lesser offense requires an additional element not needed to constitute the charged offense), then the lesser offense is not a necessarily included offense.[3] *See, e.g., LaMere,* 278 N.W.2d at 558 (holding that the offense of pointing a gun at a human being is not a necessarily included offense of assault with a dangerous weapon because "one can commit assault with a dangerous weapon by using some weapon other than a gun" and "[e]ven if one assaults someone with a gun, one may not have actually pointed the gun at the person.").

 In arguing that his conviction of conspiracy to commit murder is necessarily included in the offense of first-degree murder, defendant attaches special significance to the fact that the indictment used the language of section 609.05 in charging that Carlene Buschkopf and he "each intentionally aiding, advising, hiring, counseling, or conspiring with each other, or otherwise procuring the other to commit the crime" caused the death of Ted Buschkopf with premeditation and intent to kill. However, in our opinion, the fact that the indictment tracked the language of section 609.05 is of no significance in determining whether conspiracy is necessarily included in the offense of murder. Indeed, even if the indictment had not used "aiding and abetting" language, the jury would have been free to base the murder conviction on a determination that defendant was liable as an aider or abettor. *See State v. DeFoe,* 280 N.W.2d 38, 40 (Minn.1979) (fact that section 609.05 was not mentioned in the complaint did not bar the defendant's conviction on an aiding and abetting theory).

 Looking not to the facts alleged in the charging instrument or to the facts established at trial but to the statutory

**3.** This test cuts both ways. Sometimes the determination that an offense was not a necessar-

ily included offense benefits the defendant.

definitions, we conclude that one can commit first-degree murder without necessarily committing the lesser offense of conspiracy to commit first-degree murder. Indeed, in our experience in reviewing first-degree murder convictions, many—if not most—people who commit first-degree premeditated murder do so without having entered into any conspiracy to do so. Accordingly, defendant is not entitled to have the conspiracy conviction vacated pursuant to section 609.05.

Affirmed.