**STATE of Minnesota, Respondent,**

v.

**Arturo Montano MARTINEZ, Appellant.**

No. A05–696.

Supreme Court of Minnesota.

Jan. 11, 2007.

John M. Stuart, State Public Defender, Office of the State Public Defender, Minneapolis, MN, Charles F. Clippert, Special Assistant Public Defender, Bethel & Associates, St. Paul, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

PAGE, Justice.

On December 14, 2004, a Hennepin County jury found appellant Arturo Montano Martinez guilty of four counts of first-degree murder.[1] The trial court sentenced

---

1. Specifically, Montano Martinez was found guilty of count one, first-degree murder in violation of Minn.Stat. § 609.185(1) (2006); count two, first-degree premeditated murder committed for the benefit of a gang in violation of Minn.Stat. §§ 609.185(1) and 609.229 (2006); count three, felony murder in violation of Minn.Stat. § 609.185(3); and count four, felony murder committed for the benefit of a gang in violation of Minn.Stat. §§ 609.185(3) and 609.229. In addition to the counts for which he was convicted, Montano Martinez was indicted on four additional counts: count five, assault in the second de-

Montano Martinez to life imprisonment on count one—first-degree premeditated murder, and a 24–month consecutive sentence on count two—first-degree premeditated murder committed for the benefit of a gang. Montano Martinez raises three issues on appeal: (1) whether the admission of accomplice Francisco Vargas's testimony from the trial of another accomplice was error; (2) whether the admission of certain gang expert testimony was error; and (3) whether Montano Martinez's sentence is lawful. For the reasons discussed below, we affirm Montano Martinez's conviction, but vacate his sentence and remand for resentencing consistent with this opinion.

The events giving rise to Montano Martinez's conviction began on the evening of December 2, 2000. That evening, Montano Martinez was standing outside near Lake Street and Portland Avenue in Minneapolis with members of the Latin Kings gang. A car with members of the rival 18th Streeters gang, including the victim, Ernesto Ayala, approached the group. Shots were fired from the car and two Latin Kings members were wounded. Montano Martinez assisted one of the victims into a vehicle and accompanied him to the hospital. After leaving the hospital, Montano Martinez went to the home of Roberto Lopez–Rios, where a group of Latin Kings members were hanging out with members of a separate gang, the Sureños 13. According to Vargas, at some point he, Montano Martinez, Lopez–Rios, and two Sureños 13 gang members set out to find 18th Streeters to shoot in retaliation for the earlier shooting. The plan was for either Vargas or Lopez–Rios to do the shooting. Just before the shooting, Lopez–Rios attempted to hand Vargas a gun but dropped it on the floor between Montano Martinez's legs. Montano Martinez then picked it up, got out of the vehicle by crawling over Vargas, and shot at Ayala.

Montano Martinez testified in his own defense. He testified that he was a member of the Latin Kings gang and had been a member for approximately six months before shooting Ayala. He further testified that the Latin Kings commit crimes of violence, including drive-by shootings and murders. When asked about the role of retaliation and respect, he testified that when an enemy of the Latin Kings "disrespects" a King, "something" has to be done and that "[something] is harm." With respect to the night of the Ayala shooting, Montano Martinez testified that he remembered very little because he had been drinking heavily and had smoked crack and marijuana.

In his testimony, Montano Martinez admitted getting into the vehicle with Lopez–Rios, Vargas, and two others, but denied knowing about a plan to retaliate against the 18th Streeters. Montano Martinez explained that he was not aware of what was going on because he was intoxicated and under the influence of drugs. Montano Martinez testified that he fell asleep in the car, but awoke when they encountered the 18th Streeters because he felt a gun fall into his lap. According to Montano Martinez, he picked up the gun and crawled out of the vehicle and then, out of fear, shot at Ayala.

Montano Martinez fled to Mexico, but turned himself in to authorities in California in April 2004. Two Minneapolis detectives interviewed Montano Martinez while he was in custody in California and recorded a statement in which Montano Martinez admitted killing Ayala. In that statement,

gree; count six, assault in the second degree committed for the benefit of a gang; count seven, drive-by-shooting; and count eight, drive-by-shooting committed for the benefit of a gang. These four counts of the indictment were dismissed during trial.

Montano Martinez indicated that on the night of the shooting the group in the car went to the scene of the shooting to retaliate against 18th Streeters gang members for the earlier shooting. He also indicated that the plan was for either Vargas or Lopez–Rios to be the shooter, but when Lopez–Rios dropped the gun, Montano Martinez picked it up, exited the vehicle, and shot Ayala. When the detectives asked Montano Martinez why he and the others in the vehicle went searching for the 18th Streeters, he responded, "[I]t was just some stupid stuff with gangs."

At trial, the state called Vargas to testify. Vargas had reached a plea agreement with the state. Pursuant to that agreement, Vargas pleaded guilty to a reduced charge of second-degree murder for the benefit of a gang and assault. The agreement required Vargas to testify at the trials of Lopez–Rios and Montano Martinez. Vargas complied with the plea agreement and testified at the trial of Lopez–Rios. However, when called to testify at Montano Martinez's trial, Vargas refused to testify against Montano Martinez, explaining that living in prison as a snitch was worse than the possibility of a longer sentence for refusing to testify. Based on Vargas's refusal to testify, the state offered Vargas's testimony from the Lopez–Rios trial as substantive evidence pursuant to Minn. R. Evid. 803(24) and *State v. Ortlepp,* 363 N.W.2d 39 (Minn.1985).

Montano Martinez's counsel objected and made the following argument:

> [P]rocedurally, he should be made to sit here and answer questions and, if he refuses, Counsel could then impeach him on his prior record, prior statements, but to suggest that we go forward with just the statement from a prior trial without my having ability to cross-examine him I think would be reversible error, if that is where Counsel is going with this.

The state indicated that it had "no problem with Counsel's approach to present [Vargas] with his testimony and his answers." With the court's permission, the state proceeded by treating Vargas as a hostile witness and reading his trial testimony from the Lopez–Rios trial aloud. Early in this process, defense counsel objected, stating, "Your Honor, I'm going to object to this matter of the transcript. He has to allow the witness either to agree or disagree that that is an accurate, truthful statement he made at that time." The court allowed the state to continue reading Vargas his Lopez–Rios trial testimony, but required that the state allow Vargas to confirm his earlier testimony and to view each page of the transcript being read.

When the state finished taking Vargas through his testimony from the Lopez–Rios trial, the trial court compelled Vargas to testify, which he did on both direct and cross-examination. While counsel for Montano Martinez was able to elicit some testimony supportive of defense theories, Vargas's testimony was largely consistent with the testimony he gave at the Lopez–Rios trial.

Don Bautista, a former member of the Minnesota Gang Strike Force, testified as an expert on criminal gangs. Bautista, who had also testified at the Lopez–Rios trial, testified generally about the Latin Kings' colors, symbols, and turf and that, in December 2000, the Latin Kings had three or more members who individually or collectively engaged in a pattern of criminal activity. Bautista further testified that he was familiar with Montano Martinez and knew him to be a Latin Kings member. With respect to the importance of respect in gang culture and the way respect played into the Ayala shooting, Bautista testified:

In this particular case, it's not brain surgery that the Latin Kings, well, as you say, the 18th Streeters at the time, were disrespected. They came by, they shot. Retaliation by the Latin Kings had to come soon after that and that is exactly what happened.

\* \* \* \*

[Ayala's death] benefited the Latin Kings, because they now got their respect back. Several hours before, like I said, when they were disrespected by the 18's and got shot at and 2 of their people were hit, they had to retaliate. Once they did retaliate, then they got their respect back.

There was also testimony that Montana Martinez told other people that he was involved in Ayala's shooting. Bryanna Redbird, who was with Montano Martinez when the 18th Streeters gang members carried out their shooting, testified that after the Ayala shooting Montano Martinez told her that "they went and blasted them fools." Armando Jaramillo testified that Montano Martinez admitted to him that he shot at the 18th Streeters gang members.

## I.

Montano Martinez first argues that the trial court committed reversible error when it admitted Vargas's testimony from the Lopez–Rios trial as substantive evidence pursuant to Minn. R. Evid. 803(24) and *Ortlepp*. He further argues that Vargas's testimony was not otherwise admissible to impeach Vargas because the state had not elicited a prior inconsistent statement. In support, Montano Martinez argues that, because Vargas was an accomplice to Ayala's murder, Vargas's testimony from the Lopez–Rios trial is inherently untrustworthy and therefore does not satisfy the reliability require-

ments of Rule 803(24) and *Ortlepp* and was inadmissible as substantive evidence.

We afford trial courts considerable discretion in admitting evidence. *State v. Stallings*, 478 N.W.2d 491, 496 (Minn. 1991); *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990). We review their evidentiary rulings for an abuse of that discretion. *State v. Byers*, 570 N.W.2d 487, 491 (Minn. 1997). We will not reverse a trial court's findings unless those findings are clearly erroneous. *Id.* Under our rules of evidence, an otherwise inadmissible hearsay statement by an available witness may be admitted at trial if the statement fits within one of the exceptions to the hearsay rule set out in Minn. R. Evid. 803. Minn. R. Evid. 802, 803; *see Ortlepp*, 363 N.W.2d at 44. The evidentiary rule at issue here is Minn. R. Evid. 803(24). In *Ortlepp*, we held that a hearsay statement made by the defendant's accomplice was sufficiently trustworthy and therefore an admissible statement under Rule 803(24) because (1) there was no confrontation problem presented by the admission of the statement as substantive evidence because the declarant testified, admitted making the statement, and was available for cross-examination; (2) there was no dispute that the declarant made the statement and no dispute as to what the statement contained; (3) the statement was against the declarant's penal interest; and (4) the state "introduced[ ] evidence which pointed strongly toward" the guilt of the accused. 363 N.W.2d at 44.

We recently made clear that we did not establish an all-encompassing four-factor test in *Ortlepp* for determining the admissibility of hearsay statements under Rule 803(24). Rather, we explained that we review the totality of the circumstances to determine whether the extrajudicial statement had sufficient guarantees of trustworthiness to be admissible under the rule.

*State v. Robinson,* 718 N.W.2d 400, 408 (Minn.2006). Therefore, although the factors articulated in *Ortlepp* provide guidance, they are not an exclusive list of the indicia of reliability relevant to our analysis.

■ Here, as in *Ortlepp*, there is no confrontation problem, nor is there any doubt about whether Vargas made the statement or what it contained. Before Vargas's testimony from the Lopez–Rios trial was admitted into evidence, Vargas admitted giving the testimony and indicated that he told the truth at the time that he gave it. Moreover, because Vargas admitted giving the testimony, there is no dispute over whether he made the statement or what it contained. Finally, it should be noted that Vargas ultimately testified at Montano Martinez's trial and was subject to cross-examination. While Vargas was a reluctant witness, his testimony was largely consistent with his testimony from the Lopez–Rios trial.

Also, as in *Ortlepp*, there was a significant amount of evidence introduced at trial pointing towards Montano Martinez's guilt. That evidence included Montano Martinez's trial testimony and his self-incriminating statement to the police, both of which corroborate much of Vargas's testimony from the Lopez–Rios trial and point toward finding Montano Martinez guilty. The state also introduced testimony from Redbird and Jaramillo indicating that Montano Martinez had told them that he was involved in Ayala's murder.

Based on the totality of the circumstances, we conclude that Vargas's statements from the Lopez–Rios trial are sufficiently trustworthy and were admissible as substantive evidence under Rule 803(24). Therefore, the trial court did not abuse its discretion when it admitted them.

II.

At trial, the state offered the testimony of gang expert Don Bautista who testified generally about the Latin Kings gang and specifically about the night of Ayala's shooting. Montano Martinez did not object to this testimony at trial and, in fact, vigorously cross-examined Bautista (with particular emphasis on several points beneficial to his defense theory). Montano Martinez now asserts that, despite his failure to object, this court should address the admissibility of Bautista's testimony because it was plain error affecting his substantial rights.

Specifically, Montano Martinez asserts that Bautista's testimony that Montano Martinez was a member of the Latin Kings gang and that the crime was committed for the benefit of a gang was error because it was testimony that went to an ultimate issue in the trial. The state asserts that, even if the admission of Bautista's testimony was error, the testimony did not affect Montano Martinez's substantial rights because there was ample independent evidence both linking Montano Martinez to the Latin Kings and demonstrating that the murder was premeditated retaliation for the benefit of a gang.

■ Failure to object to the admission of evidence generally constitutes a waiver of the right to appeal on that basis; however, this court has discretion to consider an error not objected to at trial if it is plain error that affects substantial rights. *State v. Taylor,* 650 N.W.2d 190, 205 (Minn.2002); *State v. Griller,* 583 N.W.2d 736, 740, 742 (Minn.1998). In order to constitute plain error, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. *Griller,* 583 N.W.2d at 740. If any one of these prongs is not met, the claim fails and will not be considered. *Id.* If all three prongs are met, then we will "assesses whether [we]

should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

We have considered the admissibility of gang expert testimony in four recent cases: *State v. Jackson,* 714 N.W.2d 681 (Minn.2006); *State v. Blanche,* 696 N.W.2d 351 (Minn.2005); *State v. DeShay,* 669 N.W.2d 878 (Minn.2003); and *State v. Lopez–Rios,* 669 N.W.2d 603 (Minn.2003). In each case, there was ample independent evidence linking the defendant to the gang and supporting a conclusion of guilt as to the crime charged. *Jackson,* 714 N.W.2d at 693; *Blanche,* 696 N.W.2d at 374; *DeShay,* 669 N.W.2d at 888; *Lopez–Rios,* 669 N.W.2d at 613. In each case, we concluded that the expert corroborated the testimony of numerous witnesses and likely was no more influential than much of the other evidence presented linking the defendant to the crime. *Jackson,* 714 N.W.2d at 693; *Blanche,* 696 N.W.2d at 374; *DeShay,* 669 N.W.2d at 888; *Lopez–Rios,* 669 N.W.2d at 613. And, in each of those cases, we concluded that reversal was not warranted because the error did not affect substantial rights. *Jackson,* 714 N.W.2d at 693; *Blanche,* 696 N.W.2d at 374; *DeShay,* 669 N.W.2d at 888; *Lopez–Rios,* 669 N.W.2d at 613.

■ On the record presented here, we need not determine whether the admission of Bautista's gang expert testimony was error or whether, if error, the error was plain because any possible error did not affect Montano Martinez's substantial rights. As in Jackson, *Blanche, DeShay,* and *Lopez–Rios,* there was ample independent evidence establishing that Montano Martinez was a member of the Latin Kings gang and that the shooting of Ayala was for the benefit of a gang. That evidence includes Montano Martinez's testimony that he was a member of the Latin Kings gang. Vargas's testimony, corroborated by Montano Martinez's statement to police, the testimony of other Latin Kings members, Montano Martinez's trial testimony with respect to the role of respect and retaliation, and the timing of the shooting all support the conclusion that Montano Martinez killed Ayala in retaliation for the 18th Streeters' earlier shooting. Thus, while Bautista's testimony may have been cumulative, it merely confirmed the testimony of other witnesses and did not affect Montano Martinez's substantial rights.

### III.

■ Montano Martinez was sentenced to life in prison on count one, first-degree premeditated murder, and a consecutive sentence of 24 months in prison on count two—first-degree premeditated murder committed for the benefit of a gang. Montano Martinez argues, and the state agrees, that the court erred when it imposed Montano Martinez's sentence in that manner. They are correct. As we said in *State v. LaTourelle,* 343 N.W.2d 277, 284 (Minn.1984): "[T]he proper procedure to be followed by the trial court when the defendant is convicted on more than one charge for the same act is for the court to adjudicate formally and impose sentence on *one count only.*" (Emphasis added.)

Here, Montano Martinez was found guilty on four counts and the court adjudicated formally and imposed sentences on counts one and two. Therefore, we vacate Montano Martinez's sentences and remand to the trial court for resentencing.[2]

---

**2.** Montano Martinez argues that any sentence imposed for a conviction of a crime "committed for the benefit of a gang" requires compliance with the Minnesota Sentencing Guide-

lines as well as the United States Supreme Court's decision in *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). This argument is unavailing. As we

Affirmed in part, vacated in part, and remanded for resentencing.

said in *Lopez–Rios*, "In a crime committed for the benefit of a gang, the underlying crime is an included crime." 609 N.W.2d at 615 (quoting *State v. Matelski*, 622 N.W.2d 826, 833 (Minn.App.2001)). Because the underlying crime here is first-degree murder, the sentencing guidelines do not apply. Minn. Sent. Guidelines V ("First Degree Murder is excluded from the guidelines by law.").