**STATE of Minnesota, Petitioner,**
**Appellant,**

v.

**James Dwight STALLINGS, Respondent.**

**No. C6–91–127.**

Supreme Court of Minnesota.

Dec. 20, 1991.

Rehearing Denied Jan. 28, 1992.

John M. Stuart, State Public Defender, Steven R. Russett, Asst. Public Defender, St. Paul, for respondent.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas J. Foley, Ramsey County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for appellant.

COYNE, Justice.

The issue on this criminal appeal is whether, as a divided court of appeals held, the trial court prejudicially erred in denying a defense request to admit hearsay evidence under Minn.R.Evid. 804(b)(5), the second of the two so-called "catchall" exceptions to the hearsay rule [the other being R. 803(24)]. *State v. Stallings,* 474 N.W.2d 645 (Minn.App.1991). We hold that the trial court did not abuse its discretion in ruling as it did, and we reverse the court of appeals and reinstate the judgment of conviction.

Defendant's convictions of assault in the second and third degrees arose out of an incident at the apartment of Melinda Hutchinson, a woman with whom he had had a relationship for a number of years but with whom he was not then living. On Saturday evening, June 30, 1990, Hutchinson had a birthday party for her young son in her apartment, a unit in a high-rise complex in St. Paul. One of the people she invited to the party was the victim, 20-year-old Darren Stigger, who lived on a different floor in the building. Hutchinson had encountered Stigger and Stigger's best friend, Tyrone Riley, in the lobby of the building earlier that day and, although she did not know either of them, invited them to the party. Defendant also was present at the party. When Stigger and Riley left, Hutchinson briefly left her unit and walked with the two men down the hall. Stigger testified that defendant came out into the hall and told Hutchinson that she "best get" back into the apartment or he would "kick her ass." Stigger asked, "Why do you want to beat her up, that's stupid," and defendant replied, "She's my wife." Defendant then slammed the door, locking out Hutchinson. However, as Stigger and Riley boarded the elevator, Riley heard defen-

dant open the door and let Hutchinson enter.

A short time later Hutchinson's 12–year-old cousin, Kenneth Hutchinson, who was spending the weekend with her, came up to Stigger's apartment and summoned the two men, saying that Hutchinson's boyfriend was beating her up. By the time Stigger, Riley and Kenneth arrived at Hutchinson's apartment, defendant had left. Hutchinson was crying.

Defendant later called and Stigger answered the phone, telling defendant that Hutchinson was upset and did not want to talk with him. The telephone apparently rang again several times but, according to Stigger, no one answered it. Around 2:00 a.m. defendant knocked on the door (he could be seen through the peep hole), but left after Stigger told him that Hutchinson said not to let him enter.

Around 6:00 a.m. Riley, who lived in Minneapolis, called a cab and left. Stigger fell asleep on the bed in the bedroom, and Hutchinson lay down beside him. Kenneth Hutchinson was asleep on the sofa in the living room.

The assault occurred a short time later after defendant and one or two accomplices broke the security chain and entered the apartment. One of the two or three men was armed with a hammer. It was the state's allegation that defendant used the hammer to violently assault Stigger as he lay asleep.

Police were called at 6:48 a.m., a minute after the incident. Hutchinson had to call from the phone of a neighbor because the intruders ripped her phone off the wall and took it when they left.

Officer Steven Smith was the first officer on the scene, arriving just five minutes later at the time the paramedics arrived. He talked with Hutchinson immediately and described her as being "very uptight, nervous, anxious." Asked what had happened, she said that defendant and "O.D." had entered and that defendant had jumped on top of Stigger on the bed and started hitting him on the head with the hammer. She said that defendant hit her when she tried to intervene and that O.D. prevented her from fleeing. She quoted defendant as saying to Stigger during the assault, "I told you, nigger, I was going to kill you," then saying to her, "You bitch, you're going to get yours, too." As he left, defendant said, "Bitch, you better not call the police."

Officer Smith apparently tried but did not get much information from Kenneth Hutchinson.

Meanwhile, Stigger, who was bleeding and in serious condition, was taken to the hospital, where he received emergency treatment for multiple skull fractures.

Hutchinson voluntarily went to the police station on July 6, five days after the incident, and gave a statement in her own handwriting. In it she said that during the phone conversations that night defendant had said he had a gun. She repeated what she had told the officer immediately after the incident. She also said that defendant was making threats to her family members, that he was a "very violent" man who had threatened to kill any man he caught her with, that he had abused her "often," and that she was afraid of what he might do to her or someone else.

However, by July 30, when the *Florence* hearing was held to determine if there was probable cause to go forward to trial, Hutchinson testified that she had called the defense attorney to say she wanted to make changes in her written statement because she had "made a lot of false accusations out of anger." She admitted she had been in a shelter after the incident but claimed it was not because she was afraid of defendant but because her landlord evicted her from the apartment as a result of the incident. She testified that she made the false accusations because she blamed defendant for the eviction. She testified that defendant was in the living room with her during the beating and that it was O.D. who did it, not defendant. She admitted, under cross-examination by the student intern who was representing the state, that she had no hammer in her apartment, meaning that the men brought the

hammer with them. She denied telling Stigger's sister that defendant did it.

The state's evidence against defendant at trial included (a) the testimony of Stigger, who said he had no recollection of the assault, that the first thing he recalled was waking up in the hospital; (b) the testimony of the doctor who worked on Stigger; (c) the officer's testimony concerning Hutchinson's statement to him shortly after the incident, which was properly admitted substantively as an "excited utterance" pursuant to Minn.R.Evid. 803(2); and (d) the in-court testimony of Kenneth Hutchinson, the 12–year–old cousin of Hutchinson. Kenneth Hutchinson testified that he was awakened by the entry of defendant and two of defendant's "buddies," and that he heard defendant slap Hutchinson, then heard him start beating Stigger. He testified that he heard Hutchinson, using defendant's name, tell defendant to stop beating Stigger. He further testified that while he feigned sleep, he peeked and saw defendant armed with the hammer as the three men left. He testified that he also saw defendant rip Hutchinson's telephone from the wall as he left.

Defendant, who has a long history of prior felony convictions which could have been used to impeach his credibility if he had testified, did not testify nor did he call any witnesses. Hutchinson failed to comply with a subpoena and the trial court issued a bench warrant for her arrest. She called the trial judge and talked with him, saying she had not been properly served. The judge gave her until 3:00 p.m. to appear. She did not appear. The trial court sustained the state's objection to the admission of Hutchinson's *Florence* hearing testimony, saying that her statement clearly was not admissible as "former testimony" under Minn.R.Evid. 804(b)(1) and the testimony was not admissible under the "catchall" exception because the testimony had "no trustworthiness."

The court of appeals reversed, reasoning that the trial court abused its discretion in excluding the prior testimony. *State v. Stallings*, 474 N.W.2d 645 (Minn.App.1991). The court reasoned that the *Florence* testi-

mony satisfied the requirements of the "catchall" exception because (a) the testimony was given under oath and was subject to cross-examination and (b) "due process concerns require admitting" the testimony in order to counter the evidence admitted about Hutchinson's "excited utterance" to the police officer moments after the incident.

The dissenting judge pointed out that the facts the *Florence* testimony was given under oath and was subject to cross-examination are but two factors to consider in determining its trustworthiness. 474 N.W.2d at 651. The dissent then listed several factors indicating the unreliability of the testimony in this case:

> Hutchinson's refusal to appear in court to testify; the lack of corroboration for Hutchinson's *Florence* testimony; the existence of corroboration for Hutchinson's original police statements; Hutchinson's facially inconsistent explanations for the change in her testimony; the amount of time between the assault and Hutchinson's police statement as compared to the amount of time between the assault and the *Florence* hearing; Hutchinson's previous relationship with Stallings; and indications that Hutchinson's *Florence* testimony may have been coerced.

*Id.*

█ It is well to note at the outset that the Minnesota exception for "former testimony" is much more limited than the corresponding federal exception. Fed.R.Evid. 804(b)(1) defines "former testimony" as follows:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The Minnesota rule, on the other hand, defines "former testimony" as follows:

In a civil proceeding testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered or a party with substantially the same interest or motive with respect to the outcome of the litigation, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. In a criminal proceeding involving a retrial of the same defendant for the same or an included offense, testimony given as a witness at the prior trial or in a deposition taken in the course thereof.

Minn.R.Evid. 804(b)(1).

Significantly, it is usually the state that seeks to admit probable-cause hearing testimony as "former testimony." Under cases of the United States Supreme Court, there ordinarily is no confrontation clause problem to the admission of such statements against the defendant pursuant to Fed.R.Evid. 804(b)(1). *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (admission of preliminary hearing testimony against defendant), and *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (same), and discussion at 4 D. Louisell and C. Mueller, *Federal Evidence* § 487 at 1111–14 (1980). However, even under the more liberal federal rule, there is disagreement among the lower courts and among the commentators about whether such testimony should be admitted pursuant to the rule, for either the state or the defendant. For an excellent analysis counseling caution, *see* 4 D. Louisell and C. Mueller, *Federal Evidence* § 487 at 1091–94 (1980).

■ The trial court in this case correctly concluded that *Florence* hearing testimony is not admissible under the Minnesota version of the "former testimony" exception, Minn.R.Evid. 804(b)(1).

If, as the court of appeals reasoned, the facts that the witness at the *Florence* hearing took an oath and was subject to cross-examination are enough to justify admission of *Florence* hearing testimony pursuant to the "catchall" exception, R. 804(b)(5), then in effect R. 804(b)(1) has been silently amended by the court of appeals to allow the admission of *Florence* testimony as "former testimony." Furthermore, "the oath and threat of perjury prosecution have never been thought enough by themselves to justify receipt of hearsay," 4 D. Louisell and C. Mueller, *Federal Evidence* § 491 at 1214–15 (1980), and as a practical matter cross-examination at a *Florence* hearing often is not the kind of cross-examination that occurs at trial, *id.* at § 487 at 1091–94 (1980).[1]

Instead of in effect holding that all *Florence* hearing testimony is admissible under the "catchall" exception because the witness was under oath and subject to cross-examination, the court of appeals should have used the "totality of the circumstances" approach, looking to all relevant factors bearing on trustworthiness, and also should have borne in mind, as the dissent argues, that the trial court has considerable discretion in determining admission under the rule.

One example of a case using this kind of multi-factor approach is *United States v. Snyder,* 872 F.2d 1351 (7th Cir.1989), dealing with the issue of the admission of grand jury testimony under the "catchall" exception. There the court said that in assessing the reliability of the witness' former testimony or statements under the "catchall" exception, the trial court should consider these matters:

[T]he character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify

---

**1.** Defense counsel may decide to "hold back" in cross-examining state's witnesses in order to avoid preparing those witnesses "for what is to come at trial," and the prosecutor may limit his or her cross-examination of defense witnesses because "the strategy at the [*Florence* ] hearing is simply to justify holding the accused [for trial]." *Id.*

before the grand jury; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability. (citations omitted).

*Id.* at 1355–56. This approach is consistent with the cautious approach we have used in prior cases under the "catchall" exception. *See, e.g., State v. Renier,* 373 N.W.2d 282, 286 (Minn.1985), and *State v. Daniels,* 361 N.W.2d 819, 830 (Minn.1985).

Use of the totality-of-circumstances approach leads us to the conclusion that the *Florence* hearing testimony of Hutchinson was untrustworthy. Since refusing to admit evidence under either of the "catchall" exceptions "may properly be predicated upon * * * the presence of suspicious circumstances raising doubt as to the motives or accuracy of the declarant," 4 D. Louisell and C. Mueller, *Federal Evidence* § 472 at 929–30 (1980), the trial court acted within its considerable discretion in excluding the evidence.

■ In this regard, we reject the court of appeals' conclusion that due process requires the admission of Hutchinson's *Florence* hearing testimony because her "excited utterance" was admitted. What the court in effect is saying is that if one hearsay statement of a declarant is presented by the state and is properly admitted against the defendant pursuant to a hearsay exception, then the trial court must admit any other hearsay statement of the declarant despite the trial court's conclusion that that statement is not independently admissible. The cases cited by the court of appeals are not on point.[2]

Reversed and judgment of conviction reinstated.

**2.** Because of our disposition, we need not and do not address the question of whether any error in admitting the testimony would properly be deemed to be prejudicial error requiring a new trial.