**STATE of Minnesota, Respondent,**

v.

**Samuel Lee BYERS, petitioner, Appellant.**

No. C4–96–212.

Supreme Court of Minnesota.

Nov. 20, 1997.

John M. Stuart, Minn. State Public Defender, Bruce L. McLellan, Sp. Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Paul R. Scoggin, Asst. County Atty., Minneapolis, for respondent.

Heard, considered, and decided by the court en banc.

## OPINION

PAGE, Justice.

Appellant Samuel Lee Byers ("Byers") was indicted for first-degree murder by a Hennepin County Grand Jury for the shooting death of Roy Griffin, Sr. ("Griffin"). After a jury trial, Byers was acquitted of first-degree murder, but was convicted of second-degree felony murder in violation of Minn. Stat. §§ 609.19(2), 609.11, and 609.05 (1996) and sentenced to 240 months in prison. Byers appealed, and the court of appeals affirmed, concluding that although the trial court erred in admitting a co-defendant's out-of-court statement,[1] the error was harmless beyond a reasonable doubt.

On appeal, Byers contends that admission of the out-of-court statement from the co-defendant, who was unavailable to testify at his trial, constituted inadmissible hearsay and violated his right to confrontation under the Sixth Amendment to the United States Constitution. Byers further contends that because admission of the co-defendant's out-of-court statement was not harmless beyond a reasonable doubt, he is entitled to a new trial. While we agree with the result reached by the court of appeals, we conclude that the court of appeals erred in its analysis. Therefore, we affirm on other grounds.

The record from Byers' trial indicates that Griffin was shot and killed during a robbery of his apartment located at 2701 15th Avenue South in Minneapolis. Griffin shared the apartment with his girlfriend, Denise Berry ("Berry"), and his six-year-old son Roy Griffin, Jr. ("Griffin Jr."). At approximately 5:30 p.m. on March 31, 1995, two men, one of them allegedly Byers, knocked on the front door of Griffin's apartment. Present in the apartment at that time were Griffin, Berry, Griffin Jr., and Griffin's cousin, Christopher

---

1. The out-of-court statement consisted of selected portions of the co-defendant's testimony from the co-defendant's separate trial.

Minor ("Minor"). The two men were let in to the apartment and spoke with Griffin about buying marijuana. Shortly after the two men were let in, there was another knock on the door. The man alleged to be Byers answered the door, and two additional men entered the apartment. As they did so, all four men who had entered the apartment brandished handguns. The men, two wearing baseball caps[2] and two wearing knit caps, ransacked the apartment, demanded to know where Griffin's drugs were located, and instructed Griffin, Berry, Minor, and Griffin Jr. not to "try anything funny." Griffin was held at gunpoint by one of the robbers on the floor of his bedroom. Griffin Jr. was also held in that bedroom. Berry and Minor were held at gunpoint in the apartment's living room, face down on the floor. As Griffin was being held on the floor, he attempted to get up and was hit in the head with a gun. When he attempted to get up a second time, he was shot point blank in the left temple. The four men involved in the robbery then fled the apartment, left the building, and ran into the alley behind Griffin's apartment building. That alley runs north and south between Bloomington Avenue and 15th Avenue South.

Joanna Amos ("Amos") testified that, on the afternoon of Griffin's murder, as she and a friend were walking home from the grocery store, she observed four young men running south down the alley towards 28th Street East. When the young men reached 28th Street East, two of them turned east on 28th Street East and two crossed 28th Street East, continued down the alley, and turned at a building on the north end of the block. The four young men were wearing dark, baggy, oversized clothes. Two of the young men Amos observed were wearing knit caps, and one was carrying a large purse. Amos was otherwise unable to identify any of the young men. Following up on a tip to check the garbage cans between Bloomington Avenue and 15th Avenue South in the area of 28th Street East, the police found two knit caps and two baseball caps, one with a Se-

attle Mariners logo and the other with a North Carolina Tarheels logo.

Police received a tip which led them to Charles Williams ("Williams"), stepfather of Dwyon Tatum ("D.Tatum"). During a police interview with Williams he indicated that D. Tatum may have had something to do with Griffin's shooting. Police also interviewed John Tatum ("J.Tatum") D. Tatum's brother. In a statement to police and in testimony before the grand jury, Tatum indicated that a number of young men, all members of the Rolling 60s Crips gang, including his brother D. Tatum, Byers, and two young men identified as Robert, a/k/a "Killer Bee," and Dennis a/k/a "Little Cisco," had been at his home on the afternoon of the murder. According to J. Tatum, the young men were smoking marijuana on his porch and trying on masks and baseball caps. He also indicated that his brother owned a baseball cap with a North Carolina logo and that "Little Cisco" owned a baseball cap with a Seattle Mariners logo.

At Byers' trial, J. Tatum was a reluctant witness and his testimony was limited. He testified that his brother and the other young men were at his home on the day of the murder, that they were members of the Rolling 60s Crips gang, and that he had overheard them planning a robbery. He claimed to have no recollection of seeing Byers and the other young men trying on masks. J. Tatum also testified that when he arrived home from work that evening, after Griffin's murder had taken place, he found a Seattle Mariners baseball cap, a North Carolina Tarheels baseball cap, and two knit masks on his doorstep. At Byers' trial, the State contended that the baseball caps and masks found on J. Tatum's doorstep were intended to send a message to J. Tatum and his wife, Sandra Tatum ("S.Tatum") to "keep quiet or else." Sometime after Griffin's murder, J. and S. Tatum moved to a new location. Shortly after the move, a Rolling 60s Crips' gang symbol was spray painted on the back of their house. The state contended that this gang symbol was intended to intimidate J. and S. Tatum.

---

**2.** One of the baseball caps had a Seattle Mariners logo and the other had a North Carolina Tarheels logo.

Both Berry and Minor testified at Byers' trial. In addition to their testimony concerning the events which took place at Griffin's apartment on the afternoon of Griffin's murder, each positively identified Byers as one of the gunmen involved in the robbery and murder. Berry identified Byers in a police photo line-up prior to trial and at trial. According to her testimony, one of the gunmen held a gun to her head and stole her purse. She testified that she got a good look at that gunman. From the witness stand Berry identified Byers as that gunman. Minor also identified Byers from a police photo line-up, but, at that time, stated that he could not be certain of his identification unless he saw Byers in person. Upon seeing Byers in person at trial, Minor positively identified Byers as one of the gunmen involved in the robbery and murder.

Rolling 60s Crips member D. Tatum was also charged in connection with Griffin's murder and was tried separately. D. Tatum's trial took place before Byers' trial. D. Tatum testified on his own behalf at his trial and was ultimately acquitted. At Byers' trial, the trial court sought to compel D. Tatum to testify and offered him use immunity. In response, D. Tatum explained that his life might be in danger if he testified against Byers. While D. Tatum claimed that he did not fear retaliation from Byers, he acknowledged that one of the rules of the Rolling 60s Crips was that gang members did not testify against each other. Because of D. Tatum's refusal to testify after the grant of immunity, the trial court found that D. Tatum was an unavailable witness, that D. Tatum's testimony from his trial (hereinafter "D. Tatum's testimony") was trustworthy, and that, because Byers procured D. Tatum's unavailability, Byers waived his Sixth Amendment right to confront D. Tatum. As a result, the trial

court, over Byers' strong objection, permitted selected portions of D. Tatum's testimony to be read to the jury at Byers' trial.[3]

At his trial, Byers testified on his own behalf and denied any involvement in Griffin's murder. He testified that he joined the Crips gang in Cleveland, where he grew up, that he met D. Tatum after moving to Minneapolis, and that he joined the Rolling 60s Crips around Christmas of 1994. He admitted that he had been with D. Tatum, "Killer Bee," "Little Cisco," and other Rolling 60s Crips members at J. Tatum's apartment on the afternoon of the murder, but testified that he left the apartment before 5:00 p.m. and went to Brooklyn Center to spend the night at the home of his girlfriend, Tarsha Abron ("Abron"). Abron's testimony supported Byers' story that Byers was with her at the time of Griffin's murder.

Byers appealed his conviction to the court of appeals which held that the admission of D. Tatum's testimony was error because the testimony lacked "sufficient guarantees of trustworthiness" necessary for admission under Rule 804(b)(5) of the Minnesota Rules of Evidence and because, in finding that Byers "waived" his right to confrontation, the trial court failed to honor Byers' constitutional right. *State v. Byers*, 554 N.W.2d 744, 748–49 (Minn.App.1996). Although the court of appeals concluded that the admission of D. Tatum's testimony was error, it held that the error was harmless beyond a reasonable doubt and affirmed Byers' conviction. *Id.* at 749.

■■■ We review the trial court's evidentiary rulings for an abuse of discretion, and it is well settled that we will not reverse a trial court's findings unless those findings are clearly erroneous. *State v. Starkey*, 516

---

3. The testimony read to the jury can be summarized as follows: D. Tatum testified that he and several other members of the Rolling 60s Crips gathered at his brother's house on the day of the murder and smoked marijuana. They discussed robbing Griffin. According to D. Tatum, the idea for the robbery originated with Byers. D. Tatum testified that he told his fellow gang members that he did not want any part of robbing Griffin and that he went to the apartment of a friend who lived in the same building as Griffin rather than participate in the robbery. According to D.

Tatum, he remained in the vicinity to see what was going to happen. What he saw, after a few minutes, was several men running through the alley behind Griffin's apartment building, one of whom he was "pretty sure" was Byers. D. Tatum testified that Byers later admitted to him that Byers was one of the men who entered Griffin's apartment and committed the robbery and murder, that "Killer Bee" was the one who pulled the trigger, that Byers had taken "her" [Berry's] purse, and that he had thrown the purse away.

N.W.2d 918, 925 (Minn.1994); *State v. Kulseth*, 333 N.W.2d 635, 637 (Minn.1983). We afford the trial court considerable discretion in admitting evidence. *State v. Stallings*, 478 N.W.2d 491, 496 (Minn.1991); *State v. Glaze*, 452 N.W.2d 655, 660 (Minn.1990).

An otherwise inadmissible hearsay statement may be admitted at trial if the statement fits within one of the exceptions to the hearsay rule set out in Rule 804 of the Minnesota Rules of Evidence. The exception called into question in this case is found in Rule 804(b)(5), the so-called "catchall" exception:

> (5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name, address, and present whereabouts of the declarant.

Minn. R. Evid. 804(b)(5). However, before any hearsay exception under Rule 804 applies, the declarant must be unavailable as a witness.

Therefore, in order for D. Tatum's testimony to have been properly admitted at Byers' trial, D. Tatum must have been unavailable as a witness at Byers' trial and the testimony must have sufficient guarantees of trustworthiness. The issue of D. Tatum's unavailability is not before us as the parties do not dispute that D. Tatum was "unavailable" to testify at Byers' trial. Thus, we are left with the questions of whether the trial court abused its discretion in finding that D. Tatum's testimony contained sufficient guarantees of trustworthiness and whether that finding was clearly erroneous.

Byers contends that D. Tatum's testimony was untrustworthy in that D. Tatum, at the time of his testimony, had a strong motive to lie because testimony implicating Byers may have tended to exculpate Tatum at his own trial[4] and that D. Tatum's testimony about Byers' involvement in the Griffin murder played an important part in the jury's determination of guilt.[5] We are not persuaded by this argument. In *State v. Stallings*, the trial court refused to admit statements made by an unavailable witness during sworn testimony at a pre-trial hearing. 478 N.W.2d at 494. The court of appeals reversed, reasoning that the "testimony satisfied the requirements of the 'catchall' exception because (a) the testimony was given under oath and was subject to cross-examination and (b) 'due process concerns require admitting' the testimony in order to counter the evidence admitted about [the witness'] 'excited utterance' to the police officer moments after the incident." *Stallings*, 478 N.W.2d at 494. Noting that the trial court has considerable discretion in excluding evidence and that the refusal to admit evidence under the catchall exception "may properly be predicated upon * * * the presence of suspicious circumstances raising doubt as to the motives or accuracy of the declarant," *Stallings* at 495–96 (quoting 4 D. Louisell and C. Mueller, *Federal Evidence* § 472 at 929–30 (1980)), we reversed. In doing so, we endorsed the "totality of the circumstances" approach for determining the trustworthiness, and therefore, the admissibility of otherwise inadmissible hearsay statements under the "catchall" ex-

---

**4.** Byers testified that by implicating him in Griffin's murder, D. Tatum was merely trying to place the blame for Griffin's murder on him in order to clear himself and to protect other gang members with whom D. Tatum had a closer relationship.

**5.** While it is true that the testimony may have played a role in the jury's determination of guilt, it must be pointed out that were it not for D. Tatum's testimony, Byers might well have been convicted of first-degree murder, instead of the lesser offense of second-degree murder.

ception. *Id.* at 495–96. This approach requires the reviewing court to look at:

> [T]he character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify before the grand jury; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability.

*Id.* at 495–96 (quoting *United States v. Snyder,* 872 F.2d 1351, 1355–56 (7th Cir.1989)).

Prior to *Stallings,* we had applied this approach in *State v. Hansen,* 312 N.W.2d 96 (Minn.1981). In *Hansen* the trial court, under Minn. Rule 804(b)(5), admitted an unavailable witness' out-of-court statement to the police at a criminal defendant's trial. On appeal, this court concluded that the witness' statement did "not withstand the careful examination necessary to determine whether it possess[ed] sufficient guarantees of trustworthiness," *Hansen,* 312 N.W.2d at 101, because the statement was not made under oath, was not tested by cross-examination, was motivated by monetary reward, and was not corroborated. *Id.* at 102. Here, the trial court carefully examined the totality of the circumstances surrounding D. Tatum's testimony. Based on that examination, the trial court, exercising its considerable discretion, found that D. Tatum's testimony was trustworthy.

■ Using the factors we identified in *Stallings,* our careful examination of the totality of the circumstances surrounding D. Tatum's testimony leads us to conclude that the trial court did not abuse its discretion in admitting the testimony. D. Tatum's testimony was obtained under oath, was voluntary, subject to perjury, and was not recanted; the testimony was vigorously challenged by cross-examination [6] and was not made as a result of any monetary reward; D. Tatum was unavailable to testify at Byers' trial because of his relationship with Byers; at the time of D. Tatum's testimony, both he and Byers were Rolling 60s Crips gang members and D. Tatum's relationship with the government was hostile; and D. Tatum's testimony was corroborated by Berry and Minor, two victims of the robbery who were present when Griffin was murdered, and who positively identified Byers as having been one of the intruders involved in the robbery and murder, but not the shooter. In addition, D. Tatum's testimony was further corroborated by Amos, Officer Green, and other testimony from Berry. According to D. Tatum, Byers told him that he stole "her" [Berry's] purse and subsequently threw it away. Berry testified that Byers held a gun to her head and stole her purse. Amos testified that one of the four young men she observed running down the alley was carrying a large purse. Officer Green stated that after having been discarded, the purse was recovered and turned in to the police. Looking at the totality of the circumstances surrounding D. Tatum's testimony, we conclude that D. Tatum's testimony contains the guarantees of trustworthiness necessary for admissibility under Rule 804(b)(5).

■ Having concluded that D. Tatum's testimony was properly admitted under Rule 804(b)(5), its admissibility must still survive constitutional challenge under the Sixth Amendment's confrontation clause. *See Hansen,* 312 N.W.2d at 102. On the record before us, D. Tatum's testimony survives such a challenge. The test for determining whether the admission of a witness' statement under a hearsay exception constitutes a violation of the confrontation clause is: is the declaration necessary, and is it reliable. *Id.* (citing *Ohio v. Roberts,* 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65 L.Ed.2d 597 (1980)).

---

6. While it is true that it was the State, and not Byers who cross-examined D. Tatum, the State had little reason to "hold back" in its cross-examination or to accept D. Tatum's contention that Byers was involved in the Griffin murder. *See Stallings,* 478 N.W.2d at 495, n. 1. The record from D. Tatum's trial demonstrates that, on cross-examination, the State challenged D. Tatum's statement regarding Byers, questioned D. Tatum's own propensity to rob Griffin, and attempted to demonstrate to the jury that D. Tatum harbored ill-will towards Griffin.

The necessity requirement is met here as a result of D. Tatum's unavailability due to his refusal to testify. The reliability requirement is also met. "Statements which are made under oath and subject to cross-examination may be sufficiently reliable to protect the values associated with the confrontation clause." *Hansen,* 312 N.W.2d at 102 (citations omitted). Here, D. Tatum's testimony was cross-examined, given under oath, and corroborated by two eyewitnesses to the murder.[7] The United States Supreme Court, in *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895), noted that the "primary object" of the confrontation clause is to force a declarant to be cross-examined as well as "compelling him to stand face to face with the jury in order that they may * * * judge * * * whether he is worthy of belief." Here, that primary object was met. At D. Tatum's trial, D. Tatum testified on his own behalf, and a jury stood in judgment of him and found his testimony so believable that he was acquitted of any culpability in the Griffin murder. Under the facts presented by this case, we conclude that the admission of D. Tatum's testimony survives Byers' confrontation clause challenge.

 Finally, we conclude that the trial court's finding that Byers procured D. Tatum's unavailability and, therefore, waived his right to object to the admission of D. Tatum's testimony was not clearly erroneous. In *Hansen,* we said, "[t]o find a waiver based [solely] on a witness' reluctance to testify, absent any evidence of threats attributable to defendant, would destroy the right of confrontation in nearly all cases of alleged crimes against persons." 312 N.W.2d at 105. However, we also indicated that "a defendant who procures the absence of a witness by threats impliedly waives his right to confrontation." *Id.* at 104. In concluding that the trial court did not err in finding that Byers waived his right to object to the admission of D. Tatum's testimony, we do not overrule *Hansen* or hold that a waiver based solely on

D. Tatum's reluctance to testify is proper. Nor do we ignore "that courts must indulge every reasonable presumption against the loss of constitutional rights." *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970). Rather, we simply recognize that, based on the record before us, it is clear that the trial court had ample evidence before it to find that Byers procured D. Tatum's absence.

This is not a case where either the existence of the Rolling 60s Crips' conspiracy of silence or Byers' and D. Tatum's participation in that conspiracy are based on speculation or surmise. The record is clear. Both D. Tatum and Byers were members of the Rolling 60s Crips; each was aware of, agreed to, and participated in the conspiracy of silence. Implicit in that conspiracy of silence was the threat of violence against any member who broke the agreement to remain silent. By agreeing in the first instance to the conspiracy of silence for their mutual aid and protection, each member of the Rolling 60s Crips, including Byers and D. Tatum, benefits from that agreement without necessarily having to resort to actual, or even threatened, violence. Through his participation in the Rolling 60s Crips' conspiracy of silence, Byers procured D. Tatum's absence as surely as if he had directly threatened or inflicted actual violence on D. Tatum.[8]

Further, if overt acts of witness intimidation are necessary in order to find that the defendant has waived his right to object to the admission of prior testimony of an unavailable witness, there is ample evidence in this record which supports the conclusion that Byers waived his right to object. Throughout his trial, Byers was attired in the "colors" of the Rolling 60s Crips. During the trial, the courtroom was empty of spectators until D. Tatum was called to testify. At that point, several young men, also dressed in the colors of the Rolling 60s Crips, appeared as spectators in the courtroom in what realistically can only be described as an effort to

---

7. Further, the other factors discussed above which provide the guarantees of trustworthiness necessary for admission of D. Tatum's testimony under Rule 804(b)(5) also serve to buttress D. Tatum's testimony and increase its reliability.

8. In some respects, a conspiracy of silence is more effective and more efficient than having to make threats of or engage in actual violence.

intimidate D. Tatum.[9] This obvious, and obviously successful,[10] effort on the part of the Rolling 60s Crips, including Byers, to intimidate D. Tatum should not benefit Byers.

■ If you can intimidate a witness in open court with impunity, there is no need to engage in violence or threats of violence. As a practical matter, if a defendant may procure a witness' silence by agreement for the mutual aid and protection of both the witness and the defendant, as is the case here, there will never be a need to make direct threats or engage in actual violence, and the defendant will never suffer any adverse consequences as a result of his or her participation in the agreement. Accordingly, we recognize that a witness' absence and silence may be procured by agreement as effectively as it can be by violence or threats of violence. Byers' flagrant parading of his gang's colors during the trial, the presence of other gang members at strategic times during the trial, and efforts to silence other prospective witnesses, taken as a whole, lead to the inescapable conclusion that Byers procured D. Tatum's absence.

The record adequately demonstrates that D. Tatum's testimony, when viewed in light of the "totality of the circumstances," was trustworthy and reliable,[11] and, therefore, admissible; that D. Tatum's testimony survives challenge under the Sixth Amendment; and, that Byers waived his right to complain about the admission of D. Tatum's testimony.

Affirmed as modified.

STRINGER, Justice, dissenting.

I respectfully dissent. I disagree with the majority in its conclusion that D. Tatum's prior testimony had sufficient indicia of trustworthiness to be admissible under Rule 804(b)(5), or that D. Tatum's statement met the higher standard of reliability required to justify denying Byers' right to cross-examine him in exercise of Byers' Sixth Amendment right of confrontation. I further disagree with the majority's conclusion that Byers waived his Sixth Amendment right to confront and cross-examine D. Tatum. It is my view that the error in admitting D. Tatum's prior testimony was not harmless beyond a reasonable doubt, and I therefore would reverse and remand for a new trial.

The parties do not dispute that D. Tatum was "unavailable" to testify at Byers' trial and that under appropriate circumstances the prior testimony of an unavailable witness may be admitted at trial as substantive evidence without violating the rules of evidence. Minn. R. Evid. 804. The prior testimony of an unavailable witness may be admitted in evidence if it meets a recognized exception to the hearsay rule, or the "catchall" exception.[12]

Since D. Tatum's testimony does not fit within the four firmly rooted exceptions set forth in Minn. R. Evid. 804(b) to the hearsay exclusion, it must be examined under 804(b)(5), the "catchall" exception. Minnesota courts take a cautious approach in determining whether a statement is admissible under the "catchall" hearsay exception. *See State v. Stallings,* 478 N.W.2d 491, 496 (Minn.1991). To be admissible, the offered

9. In addition to the intimidation directed towards D. Tatum, the record reflects that S. Tatum, D. Tatum's sister-in-law, was crying and afraid to come into the courtroom to testify against Byers because of her fear that gang members were present.

10. While D. Tatum denied that Byers had threatened him, he acknowledged that his testimony might cause him "problems with other people." Indeed, at one point in Byers' trial, D. Tatum's attorney requested that D. Tatum be allowed to leave the courtroom because he feared for D. Tatum's personal safety.

11. We note that assertions of "unreliability" grow pale in the long shadows of witness manipulation.

12. Minn. R. Evid. 804(b)(5) is referred to as the "catchall" exception to the hearsay rule and requires that the declarant be unavailable as a witness. "Unavailability" is defined by Minn. R. Evid. 804(a) which states in part that:

(a) **Definitions of Unavailability.** "Unavailability as a witness" includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; * * * *

statement must have "circumstantial guarantees of trustworthiness" equal to those of the several specifically enumerated hearsay exceptions.[13] *See* Minn. R. Evid. 804(b)(5); *see also State v. Renier*, 373 N.W.2d 282, 286 (Minn.1985) (holding that a hearsay statement offered by a witness with a strong motive to lie lacked "equivalent circumstantial guarantees of trustworthiness" and was therefore inadmissible). In assessing the reliability of a witness' former testimony, the district court should consider:

> [T]he character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify * * *; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and the reasons for the witness' unavailability.

*Stallings*, 478 N.W.2d at 495–96 (quoting *United States v. Snyder*, 872 F.2d 1351, 1355–56 (7th Cir.1989)).

While this court has applied the "totality of the circumstances" test in determining whether the hearsay evidence meets the circumstantial guarantee of trustworthiness analysis, *State v. Stallings*, 478 N.W.2d 491, we must also restrict the universe of our "totality" to the specific circumstances surrounding the making of the statement, as noted by the U.S. Supreme Court in *Idaho v. Wright*:

> We agree that "particularized guarantees of trustworthiness" must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the

statement and that render the declarant particularly worthy of belief.

*Idaho v. Wright*, 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990) (citing 5 J. Wigmore, Evidence 1420 p. 251.)[14] Applying the Supreme Court's analytical framework here, D. Tatum's hearsay statement was made in his own trial under a charge of first degree murder. He testified under oath, to be sure, but this indicia of trustworthiness must be considered in light of his statement being entirely self-serving and exculpatory, and of his being a participating member of an organized criminal group, as the majority characterizes, committed to an oath of silence. In his own trial he clearly had one and only one motive——to save his own skin——and by implicating Byers, with his detailed and uncorroborated testimony, as to who did the shooting, obviously he was exculpating himself.

The majority finds comfort in D. Tatum's testimony being under oath, but we have noted that administration of an oath and the threat of prosecution for perjury do not, by themselves, establish the requisite trustworthiness for admission of hearsay that does not fit within a firmly rooted exception. *Stallings*, 478 N.W.2d at 495.

Next, the majority compares the testimony of Berry and Minor with that of D. Tatum and concludes that it is corroborative, providing additional indicia of reliability. It is true that Berry and Minor testified that Byers was in Griffin's apartment when the shooting and robbery took place, and that this testimony is consistent with D. Tatum's that Byers was present at the crime scene. D. Tatum provided far greater detail about Byers' involvement in the crime than did Berry and Minor, however. D. Tatum testified that "Killer Bee" pulled the trigger, that Byers had taken Berry's purse and that he

---

**13.** The Supreme Court has characterized the threshold of reliability of hearsay as having "particularized guarantees of trustworthiness." *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

**14.** "The theory of the hearsay rule * * * is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be

brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation." 5 J. Wigmore, Evidence § 1420, p. 251 (J. Chadbourn rev.1974).

was "pretty sure" Byers was one of the several men seen running from the scene after the shooting—all uncorroborated by any other witness. Since the jury's conviction of Byers of second degree felony murder is consistent with D. Tatum's uncorroborated testimony that Byers was present but didn't pull the trigger, D. Tatum's uncorroborated testimony appears to have played an important, if not crucial role, in the jury's determination of guilt.

Finally, as further indicia of reliability, the majority puts heavy emphasis on D. Tatum being subject to cross-examination at his own trial—as if to suggest that the role and purpose of the cross-examiner is unimportant—all that matters is that at some point he was cross-examined by someone for some purpose. Cross-examination by the state in D. Tatum's trial is hardly equivalent to Byers' right to cross-examine D. Tatum in Byers' trial, however, and it is patently obvious that the state had no interest whatsoever in demonstrating Byers' innocence when it cross-examined D. Tatum. I find the suggestion that the state's effort to prove D. Tatum's guilt through cross-examination is by any measure a substitute for Byers' right to cross-examine D. Tatum specious at best. While I have high regard for and give broad deference to the trial court's thoughtful consideration in reaching its decision that D. Tatum's testimony was admissible against a hearsay objection, I conclude that it abused its discretion in determining that the high threshold of admissibility had been met for purposes of overcoming a hearsay objection.

For many of the same reasons, I disagree with the conclusion of the majority that the state met the "more difficult requirement [of] demonstrating that the statements bear sufficient 'indicia of reliability' to avoid a conflict with the [Sixth Amendment] confrontation clause." *State v. Hansen*, 312 N.W.2d 96, 102 (Minn.1981). In *Hansen*, as the majority pointed out, we reversed a ruling of the trial court admitting prior statements of two witnesses when they were "unavailable" because they refused to testify. We determined that the prior statements were inadmissible because they were not given under oath and were *ex parte*, but most significantly, because

the defendant was precluded from cross-examining the witnesses—precisely the situation we have here. The denial of the right to cross-examine D. Tatum coupled with D. Tatum's motive to inculpate Byers in his own trial, compels us to review, with particular care, the trustworthiness of D. Tatum's testimony:

> Such [hearsay] exceptions, dispensing altogether with the literal right to "confrontation" and cross examination, have been subjected on several occasions to careful scrutiny by this Court.

*California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970). That "careful scrutiny" was applied in *Ohio v. Roberts*, testing whether whatever confrontation there might have been in the prior proceeding afforded "substantial compliance with the purposes behind the confrontation requirement." 448 U.S. 56, 69, 100 S.Ct. 2531, 2540, 65 L.Ed.2d 597 (1980) (citing *Green*, 399 U.S. at 166, 90 S.Ct. at 1939). Here, Byers had no opportunity to cross-examine D. Tatum whatsoever, and by any score, the degree of compliance with affording the protection of the Sixth Amendment was—none.

My next point of contention with the majority is its conclusion that Byers waived his Sixth Amendment confrontation right because he was a member of the Rolling 60s Crips, a gang whose members pledge to an oath of silence. Since D. Tatum was also a member, the majority concludes Byers procured D. Tatum's silence. Our reference point on this issue is, once again, *State v. Hansen*. In *Hansen*, the witness refused to testify out of fear of retaliation by defendant and expressed his fear as follows:

> "You don't dare say anything, you get smoked you know, hell they'd kill you. * * * * This party from Wadena, I'm just scared, I mean you know, no matter what, you know, you say or do, you're going to get smoked, that's all."

312 N.W.2d at 99–100. In rejecting the state's claim that the defendant waived his constitutional right of confrontation, we specifically distinguished *State v. Olson*, 291 N.W.2d 203 (Minn.1980) and *State v. Black*, 291 N.W.2d 208 (Minn.1980) on the basis that

in those cases there were histories of actual threats justifying a waiver, but in *Hansen* there was no actual threat, and fear of reprisal only was not sufficient to constitute a waiver. *Hansen,* 312 N.W.2d at 104. Here, all parties agree that Byers made no threat of any kind, and that D. Tatum refused to testify out of "problems" he had with others, but not with Byers. Questioning by Judge Rosenbaum makes it very clear that D. Tatum's refusal to testify had nothing to do with Byers:

> D. Tatum: Well, it's not because of the defendant [Byers] or nothing like that, you know. I ain't scared. It's because I have problems with other people, though. You know, he probably ain't got nothin' to do with that. I know he don't.

The prosecutor also questioned Mr. D. Tatum.

> Mr. Farber: And it's your claim that Mr. Byers has never threatened you directly, is that correct?
>
> D. Tatum: He ain't never did nothing to threaten me.

The majority relies on evidence of the gang's code of silence, spectators attending Byers' trial wearing Rolling 60s Crips colors and hats arranged in a provocative pattern on D. Tatum's porch, as proof of a threat. As dramatic as these may be, they clearly do not meet the holding of *Hansen* requiring proof of a threat that is attributable to the defendant: "[t]o find a waiver, based on a witness' reluctance to testify, *absent any evidence of threats attributable to the defendant,* would destroy the right of confrontation in nearly all cases of alleged crimes against persons." *Hansen,* 312 N.W.2d at 105 (citing *United States v. Benfield,* 593 F.2d 815 (8th Cir. 1979)) (emphasis added). The majority's determination that Byers waived his Sixth Amendment right is based on speculation and conjecture as to the nature of the threat, and it overrules our carefully crafted limits for finding a waiver claim in *State v. Hansen.* Of equally great concern is that the Sixth Amendment right of confrontation seems to be relegated to a privilege to be held or withheld, depending on the rules of the gang.

Finally, I conclude the court of appeals erred in applying a standard for harmless error on a constitutional issue based only upon whether, in the absence of D. Tatum's testimony, a typical jury would have reached the same verdict. *State v. Byers,* 554 N.W.2d 744, 749 (Minn.App.1996). In *State v. Bolte,* we reviewed the role of the appellate court in applying the harmless error analysis:

> "to examine the entire trial record and determine whether there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict; * * * if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the evidence had not been admitted, then the error in admitting the evidence was prejudicial error."

530 N.W.2d 191, 198 (Minn.1995) (internal quotations omitted) (quoting *State v. Post,* 512 N.W.2d 99, 102 n. 2 (Minn.1994)).

The error in the analysis of the court of appeals was in only measuring the extent of the other evidence of guilt, and not going on to consider whether, based upon the record as a whole, there was a reasonable possibility that the tainted evidence contributed to or was important to the guilty verdict. If the analysis on review had extended to address these additional inquiries, the answer would have been conclusively affirmative. The prosecutor stated: "I believe, Your Honor, that Mr. Tatum's testimony is crucial to this case * * *." The trial court then added its own view of the importance of the testimony: " * * * I think we all have to understand, that the prima facie case does not relieve [the state] of the burden of proving the defendant's guilt beyond a reasonable doubt, and that this testimony certainly is necessary for the State to proceed with its burden." Clearly, if both the state and the trial court believed that Byers' conviction hinged on D. Tatum's testimony, it cannot be shown beyond a reasonable doubt that the admission of that testimony did not contribute to Byers' conviction.

A review of D. Tatum's testimony indicates the state and the trial court's characterization of D. Tatum's testimony was correct. D.

Tatum strongly implicated Byers in the robbery and murder and presented the jury with evidence they received from no other source. He provided the sole testimony that Byers had conceived the plan to rob Griffin and that Byers was one of the men running from Griffin's apartment. He was the only witness who testified regarding the admissions Byers was alleged to have made after the crime that he was present at the crime scene but that "Killer Bee" pulled the trigger.

The fact that the jury acquitted Byers of first degree murder but convicted him of second degree felony murder—the unintentional killing of Griffin occurring during the robbery—strongly suggests that D. Tatum's testimony that Byers was present but "Killer Bee" did the shooting was a significant consideration in the determination of guilt by the jury.

Therefore, I would reverse the court of appeals and remand the matter for a new trial.

TOMLJANOVICH, Justice (dissenting).

I join in the dissent of Justice Stringer.